# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––––

**No. ACM 39322**

––––––––––––––––––––

## UNITED STATES
*Appellee*

v.

## Petr K. BESSMERTNYY
Airman First Class (E-3), U.S. Air Force, *Appellant*

––––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 14 June 2019

––––––––––––––––––––

*Military Judge:* Natalie D. Richardson.

*Approved sentence:* Dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 19 May 2017 by GCM convened at Altus Air Force Base, Oklahoma.

*For Appellant:* Major Dustin J. Weisman, USAF; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, MINK, and POSCH, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Chief Judge MAYBERRY and Judge MINK joined.

––––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

––––––––––––––––––––

POSCH, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of two specifications of indecent recording on divers oc-

casions, and one specification of distribution of an indecent recording on divers occasions, in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c.[1,2] The three offenses involve Appellant's recording and distributing images of his former girlfriend, KG, and recording images of a female friend and co-worker, Airman (Amn) HM. Appellant was sentenced to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises eight assignments of error on appeal:[3] (1) whether the evidence is legally and factually sufficient to support the three convictions; (2) whether the court should use the test adopted by the United States Supreme Court in *Katz v. United States*[4] to determine whether a person has a "reasonable expectation of privacy" for purposes of Article 120c, UCMJ; (3) whether the military judge erred in failing to give the members instructions on (a) the *mens rea* requirements for the "consent" and "reasonable expectation of privacy" elements of indecent recording, and (b) Appellant's mistaken belief that KG did not have a reasonable expectation of privacy at the time of the recording; (4) whether the military judge erred in failing to *sua sponte* find Appellant not guilty of wrongful broadcasting under Rule for Courts-Martial (R.C.M.) 917, or alternatively, whether trial defense counsel were ineffective in violation of the Sixth Amendment to the United States Constitution[5] for failing to move under R.C.M. 917 for a finding of not guilty of indecent recording and broadcasting[6] of KG's private parts; (5) whether the offense of indecent recording is unconstitutionally vague and overbroad on its

---

[1] All references to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial*, *United States* (2016 ed.) (*MCM*), unless specifically indicated.

[2] Appellant pleaded not guilty and was acquitted of one specification of sexual assault and two specifications of abusive sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920. Appellant also pleaded not guilty and was acquitted of one specification of assault consummated by a battery in violation of Article 128, UCMJ, 10 U.S.C. § 928.

[3] We renumbered Appellant's assignments of error.

[4] 389 U.S. 347 (1967).

[5] U.S. CONST. amend. VI.

[6] To conform with Specification 2 of Charge II as referred and tried, we conclude Appellant's counsel meant "distribution" and not broadcasting in the assignment of error.

face and as applied to Appellant; (6) whether trial counsel engaged in prosecutorial misconduct by making improper arguments during findings and rebuttal argument; (7) whether Appellant was denied effective assistance of counsel as alleged in 16 deficiencies in the performance of his trial defense counsel; and (8) whether Appellant's sentence is inappropriately severe. In addition, we address an error in the recommendation of the staff judge advocate (SJA) and consider the issue of timely appellate review. We find no prejudicial error and affirm.

## I. BACKGROUND

In July 2015, KG's boyfriend, SS, received a text message from a phone number he did not recognize offering, "[t]hese could be beneficial to you," with a link to an Internet website. SS followed the link and saw sexually explicit pictures of KG and links pointing to another website that hosted three Skype[7] video recordings of KG. The videos variously showed KG masturbating and displaying her breasts and buttocks as she conversed with someone she called, "Peter."

SS immediately contacted KG and told her about the images he saw of her online. KG went to the website and recognized the videos of her from private Skype sessions with Appellant, which she was unaware had been recorded and posted on the Internet. KG felt violated and was upset and embarrassed that these images of her had "gone public." With KG's support and assistance, SS reported the matter to agents of the Air Force Office of Special Investigations (AFOSI) at Altus Air Force Base (AFB), Oklahoma. The AFOSI agents visited the link in the text message and saw sexually explicit pictures of KG in various stages of undress[8] and links to videos of KG partially undressed and masturbating. KG explained that Appellant had the opportunity to surreptitiously record her during their private Skype sessions between January and August 2014 when they were living apart in a long-distance intimate relationship.

The AFOSI agents obtained search authorizations to seize and examine Appellant's computers and cell phone for evidence that Appellant recorded and posted the three online videos. As a result, KG subsequently identified additional private Skype sessions with Appellant in which she had been rec-

---

[7] Skype is a software application that allows two-way voice and video calls between computers and mobile electronic devices.

[8] Appellant was not charged with an offense involving the pictures.

orded without her knowledge. The members convicted Appellant of indecent recording of KG on divers occasions, between on or about 1 December 2013 and on or about 31 July 2014, and distribution of an indecent recording of KG on divers occasions, between on or about 1 May 2015 and on or about 30 May 2015, as charged in Specifications 1 and 2, respectively, of Charge II.

While searching Appellant's cell phone for images of KG, investigators found pictures of Amn HM disrobing in her on-base dormitory room, including four pictures of her naked above the hips, apparently unaware she was being photographed and recorded. Subsequent investigation and analysis confirmed the pictures were taken without her knowledge with the camera built in to her laptop computer after Appellant had returned the laptop she had given to him to repair. The members convicted Appellant of indecent recording of Amn HM on divers occasions, between on or about 1 March 2015 and on or about 31 July 2015, as charged in Specification 3 of Charge II.

Additional facts necessary to resolve the assignments of error are provided below.

## II. DISCUSSION

### A. Legal and Factual Sufficiency – Indecent Recordings and Distribution of Indecent Recordings of KG (Specifications 1 and 2 of Charge II)

Appellant challenges the legal and factual sufficiency of the findings of guilty to Specifications 1 and 2 of Charge II, which allege Appellant made and distributed an indecent recording of KG on divers occasions. We are not persuaded by Appellant's claims and conclude the convictions are legally and factually sufficient.

#### 1. Additional Facts

In July 2015, four days after KG saw videos of herself posted online from private Skype sessions with Appellant, and while the AFOSI investigation was in its initial stages, KG sent a text message to Appellant asserting that his posting "pictures" of her online was "irreversible" and stressing, "[y]ou can't take that back." She probed, "Do you have any explanation for why you could possibly justify behaving like this?" Appellant responded he did "feel bad for posting the pictures online," but "that was months ago" and he "took them down soon after." Additionally, Amn HM testified that during the period when Appellant knew he was under investigation by AFOSI, he admitted

to her that he had posted "photos" online he had received from KG when they were dating, "in retaliation" for KG revealing his infidelity with KG to his current girlfriend.[9]

Forensic analysis of digital media seized from Appellant's on-base dormitory room revealed approximately 90 recordings, some of them duplicates, which KG subsequently identified for the AFOSI agents as private Skype sessions that had been recorded without her knowledge. These recordings were found on Appellant's computer and organized in a folder named with KG's initials that was nested nine subfolders deep in Appellant's folder structure. Some filenames included KG's first name in place of the default filename that the software fashioned from the date and time when each recording was made. A number of files had names that combined KG's first name with "Catastrophe," in addition to a date and time.

Included among the 90 recordings were identical copies of two of the three Skype recordings posted on the public website. The videos showed KG masturbating and displaying her breasts and buttocks as she looked into the camera and spoke to "Peter," whose image and speech were not recorded. The Government presented records from the website that showed the recordings had been uploaded on 17 May 2015 from a specific Internet Protocol (IP) address. The Government also presented evidence in the form of a record obtained from Appellant's Internet service provider on 2 May 2017 that associated Appellant with this IP address along with a physical address on Altus AFB where Appellant lived. However, it is not clear from this record or any other evidence when Appellant had been assigned the IP address at issue. The record showed an "Install Date" of 17 July 2013, which predated the charged timeframe. The record also showed a "Lease Start" date of 31 May 2015, which was 14 days after the date that the Government claimed Appellant uploaded the videos. The Government did not call a records custodian as a witness but relied on the record as circumstantial evidence that Appellant was associated with the IP address at issue on 17 May 2015. No evidence was offered at trial that associated Appellant with two usernames used to post the videos or the text message SS received with a link pointing to the website that hosted the videos.

---

[9] Amn HM testified that Appellant explained to her that KG "had reached out to him asking for sexual favors, and he had replied no; to which, she had said she would tell his girlfriend, and then in retaliation he had taken photos that he received from her when they were dating and placed them on the Internet." This conversation occurred before Amn HM learned about images AFOSI agents discovered of Amn HM on Appellant's cell phone.

The Government presented expert testimony of a computer forensic analyst who found Skype installed on Appellant's laptop computer as well as software with a default setting to automatically begin recording when a Skype connection was established. Appellant's girlfriend, MC, testified that Appellant knew how to use the same Skype-recording software that analysts found on Appellant's computer. MC testified she had never visited the website where the recordings of KG were posted.

At trial, the Government presented the three online videos, altogether 31 minutes in length, which showed KG's bare breasts in all three videos and part of her buttocks in one. The Government also presented three recordings, totaling 40 minutes, which investigators found saved in Appellant's computer that variously showed her bare breasts, buttocks, and genitalia. In each video, KG speaks to someone but only her side of the conversation is audible except for faint sounds of low-pitch, muffled speech heard on occasion in some recordings. KG testified that the 90 recordings she identified for the AFOSI agents, including the six admitted in evidence, were exclusively recorded during private online Skype sessions with Appellant when she was living three and a half-hours away in Texas and they used Skype to stay in touch. KG explained that she had occasionally performed sexual acts like masturbating at Appellant's request when they were living apart in a long-distance relationship. KG testified she was unaware that Appellant had been recording her during these sessions and she had never discussed, much less given Appellant permission, to record her, and she did not consent to Appellant posting any of the recordings of her online.[10]

KG contrasted these recordings of her during Skype sessions with sexual images that she at times recorded of herself, which were not Skype sessions. She explained that she sometimes sent Appellant videos that she took of herself performing sexual acts at Appellant's request using her laptop computer.[11] Also at Appellant's request, KG sometimes e-mailed Appellant sexual photos she took of herself with a camera Appellant had given to her to use. KG further contrasted these Skype recordings from seven videos in the media that had been seized from Appellant in which Appellant and KG were physi-

---

[10] Before us, Appellant's counsel avers, "KG and Appellant both recorded some of their Skype sessions," however, there is no evidence in the record that KG used Skype to record herself, or Appellant, or them together, performing sexually, or that KG recorded Appellant without his consent.

[11] KG explained the files were too large to e-mail to Appellant so she used a feature in Skype to attach and transfer the files.

cally together in a sexually explicit video that she was aware of and consent-ed to Appellant recording. However, these recordings of them together were made towards the end of a prior relationship she had with Appellant that ended in May 2011, before KG graduated from high school and before they began an intimate relationship again in December 2013.

**2. Law**

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual suffi-ciency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). Though we "cannot find as fact any allegations of which [an appellant] was found not guilty at trial," we "may consider facts underlying an acquitted charge in considering whether the facts support a separate charge." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *Rosario*, 76 M.J. at 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018)). "[I]n re-solving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presump-tion of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

**3. Analysis**

### a. Indecent Recordings of KG (Specification 1 of Charge II)

The members convicted Appellant of Specification 1 of Charge II in viola-tion of Article 120c(a)(2), UCMJ, which alleged Appellant made an indecent

recording of KG on divers occasions. In order for the members to find Appellant guilty of this offense, the Government was required to prove beyond a reasonable doubt: (1) that Appellant knowingly recorded KG's private area on divers occasions; (2) that Appellant did so without KG's consent; (3) that the recordings were made under circumstances in which KG had a reasonable expectation of privacy; and (4) that Appellant's conduct was wrongful.[12] *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM),* pt. IV, ¶ 45c.b.(2). "Private area" means "the naked or underwear-clad genitalia, anus, buttocks, or female areola or nipple." Article 120c(d)(2), UCMJ, 10 U.S.C. § 920c(d)(2).

### i) Appellant Knowingly Recorded KG's Private Area without Her Consent

At trial, the Defense strategy was to discredit KG's ability to differentiate videos Appellant made during their private Skype sessions that she said she did not consent to Appellant recording (charged recordings) on the one hand, from other videos she was aware of and did consent to on the other. Appellant also challenged KG's veracity that she was unaware of, and, therefore, had not consented to Appellant making recordings of her. Appellant argued KG had a motive to lie in retaliation for Appellant revealing to SS that KG cheated on SS with Appellant in February 2015. Appellant also argued the possibility that Appellant did not knowingly record the videos because the default setting of software installed on his computer was set to record his Skype conversations as soon as a Skype connection was made.

We do not find Appellant's challenges to KG's credibility persuasive. KG had no difficulty distinguishing the charged Skype recordings she was unaware Appellant had made of her from those she sometimes recorded herself or others from a previous relationship with him where they appeared together and she was aware and did consent to Appellant recording.[13] We have con-

---

[12] The requirement for an appellant's conduct to be wrongful, i.e., without legal justification or lawful authorization, is not an element listed in the *MCM*, but it is required by the statute. *Compare* Article 120c(a), UCMJ, 10 U.S.C. § 920c(a), *with MCM,* pt. IV, ¶ 45c.b.(3).

[13] We similarly reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to question KG about the similarities between sex acts KG performed in videos she created for Appellant and sex acts KG performed in videos Appellant recorded during their Skype sessions. We find that trial defense counsel did explore similarities on cross-examination and that Appellant has not proffered other similarities that counsel were ineffective for failing to

*(Footnote continues on next page)*

sidered Appellant's challenges to KG's credibility, along with biases and motives advanced by Appellant, and have no reason to reach a different conclusion than the factfinder. While we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the members saw and heard KG's testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (citation omitted) (stating it is the members' role to determine whether testimony is credible or biased).

Forensic analysis provided direct evidence that someone who had access to Appellant's computer and knowledge of Appellant's folder structure actively managed the location and name given to the folder where recordings of KG were found on Appellant's computer. The recordings were found in a folder named with KG's initials, and someone overrode default filenames to personalize a number of these recordings with KG's first name.

This evidence of active human intervention discredits Appellant's assertion on appeal that he had no knowledge of any of the recordings because of a software program setting that automatically started recording Skype sessions when a connection was made. KG's testimony about the Skype recordings was corroborated by the testimony of a computer forensic analyst who found Skype installed on Appellant's laptop computer as well as software used to record Skype sessions. KG's testimony was also corroborated by Appellant's girlfriend, MC, who testified that Appellant knew how to use the Skype-recording software that the analyst found on Appellant's computer.

We find a rational factfinder could conclude that KG's credible testimony as corroborated by forensic evidence proved beyond a reasonable doubt that Appellant knowingly recorded her private area on divers occasions without her consent. And, we are convinced that the Government met its burden of proof on these elements.

### ii) KG Had a Reasonable Expectation of Privacy

The Government had the burden to prove Appellant made recordings of KG under circumstances in which she had a reasonable expectation of privacy. A person has a "reasonable expectation of privacy" when a reasonable person would believe (a) she could disrobe in privacy without being concerned

---

confront KG about, and thus, this issue does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

that an image of her private area was being captured; or (b) her private area would not be visible to the public. 10 U.S.C. § 920c(d)(3).[14]

Although not raised as a defense at trial, Appellant argues that KG did not have a reasonable expectation of privacy for two reasons: first, because KG would routinely consent, even invite, Appellant to view her exposed private areas as she performed sexual acts for him during Skype sessions; and second, because KG sometimes recorded herself or was aware of and did consent to Appellant recording them together in a prior relationship with him. We are not persuaded by either argument.

Appellant's first argument invites us to find that a person has no expectation of privacy, or loses what privacy she has, simply by agreeing to expose her private area to another. We disagree. A person who willingly shows her bare breasts, buttocks, and genitalia to an intimate partner would nonetheless have a reasonable expectation that her private area was not under the watchful eye of a camera operated by her partner, or the public. We find that KG's testimony that she was unaware she was being recorded combined with evidence of the private setting in which she exposed her private area to none other than Appellant did not undermine KG's expectation of privacy, much less one held by a reasonable person, and thus defeats this argument.

Appellant's second argument invites us to focus on the circumstances of recorded sexual acts when KG acknowledges she was aware of being recorded instead of the circumstances of the charged recordings when she asserts she was not. But the term, "under circumstances in which" another person has a

---

[14] Appellant, in his second assignment of error, invites us to use the *Katz* test for determining whether a Government search and seizure is lawful under the Fourth Amendment to the United States Constitution, U.S. CONST. amend. IV, to determine whether a person has a reasonable expectation of privacy under Article 120c, UCMJ. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (concluding there "is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"). However, we are not at liberty to give new meaning to a term used in an element of an offense beyond its clear, statutorily-supplied definition, and decline to do so now. *See generally United States v. Lee*, 2017 CCA LEXIS 185, at *15–16 (A.F. Ct. Crim. App. 17 Mar. 2017) (unpub. op.) (citation omitted) (rejecting application of Fourth Amendment doctrine to define "reasonable expectation of privacy" in Article 120c, UCMJ, different from its statutory definition), *rev. denied*, 76 M.J. 455 (C.A.A.F. 2017). Thus, we find no merit to this assignment of error.

"reasonable expectation of privacy" directs the factfinder and this court to look no further than circumstances when each recording was made. As properly instructed by the military judge in this case, the term means circumstances in which a "reasonable person would believe" either that "he or she could disrobe in privacy, without being concerned that an image of a private area of the person was being captured" or that "a private area of the person would not be visible to the public." *Id.*

Both alternative definitions in the statute refute Appellant's second argument. KG disrobed in the privacy of her room and exhibited her private areas to Appellant in video-chat sessions during which no one but the two participated. KG had no reason to believe that she was being recorded or that her body and actions would be visible to the public because Appellant never gave notice to KG that he was recording her sexual acts. The evidence established KG was unaware Appellant was recording her while engaged in sexual acts in the privacy of her room.

We find a rational factfinder could conclude that KG reasonably believed the charged recordings were made under circumstances in which she could disrobe in privacy without concern that her private area was being recorded or visible to the public. And, we are convinced that the Government met its burden of proof on the element that the recordings were made under circumstances in which KG had a reasonable expectation of privacy.

### iii) No Legal Justification or Lawful Authorization

Appellant similarly argues factual and legal insufficiency because KG's history of recording her own private parts and consensual performance of sexual acts for Appellant followed by sending those recordings to Appellant gave Appellant legal authorization to record her. Appellant also argues KG's history of privately recording herself performing sexual acts when she was away from Appellant, followed by her sending those recordings to Appellant gave Appellant legal authorization to record her. We are not persuaded either circumstance defeats the wrongfulness of Appellant's actions in the videos he recorded of KG without her knowledge or consent.

We find a rational factfinder could conclude that Appellant had no legal justification or lawful authorization that would excuse his culpability for making recordings of KG without her consent under circumstances in which she had a reasonable expectation of privacy. And, we are convinced that the

Government met its burden of proof on the element that Appellant's actions were wrongful.[15]

Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offense of indecent recording of KG on divers occasions, as charged in Specification 1 of Charge II, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

### b. Distribution of Indecent Recordings of KG (Specification 2 of Charge II)

The members convicted Appellant of Specification 2 of Charge II in violation of Article 120c(a)(3), UCMJ, which alleged Appellant distributed an indecent recording of KG on divers occasions. Appellant contends his conviction should be set aside because *inter alia*, as part of its proof, the Government was also required to prove that Appellant viewed KG's private area in violation of Article 120c(a)(1), UCMJ. It follows then that Appellant's conviction is legally insufficient, Appellant claims, because Appellant viewed KG's private area with her consent, which is not a violation of Article 120c(a)(1), UCMJ. Appellant's interpretation of the statute appears to be an issue of first impression, but we are not persuaded.[16]

---

[15] Appellant argues on appeal that his recording of KG was not wrongful because his conduct met the terms of an exception to the general prohibitions of the Wiretap Act of 1968, 18 U.S.C. § 2511, *et seq.*, which criminalizes secretly recorded electronic communications, unless one party to the communication, i.e., Appellant, consents to the recording. Appellant was not charged with an offense in violation of the Wiretap Act, and thus we conclude this statute cannot be used to shield conduct proscribed by Article 120c, UCMJ, from prosecution.

[16] Although Appellant casts his claim as one of legal insufficiency, more fundamentally his claim questions whether the military judge properly instructed the members on the elements of the offense of distribution of an indecent recording, which, like legal sufficiency, is a question of law we review de novo, *see United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (citation omitted), and one we review for plain error when not objected to at trial, *see United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (citation omitted). Our conclusion does not change under plain error review.

In her findings instructions to the members on the offense of distribution of an indecent recording, in violation of Article 120c(a)(3), UCMJ, the military judge did not instruct the members in the manner in which Appellant interprets the statute: the military judge did not require the Government to prove that Appellant viewed KG's private area without her consent in violation of Article 120c(a)(1), UCMJ, as a predicate to finding that Appellant committed the offense of distribution of an indecent recording, as charged in Specification 2 of Charge II, in violation of Article 120c(a)(3), UCMJ.

An issue of statutory construction is a question of law we review de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017) (citing *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016)). "Unless ambiguous, the plain language of a statute will control unless it leads to an absurd result." *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012) (citation omitted). "Whether the statutory language is ambiguous is determined 'by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Any ambiguity should be resolved in favor of lenity. *United States v. Murphy*, 74 M.J. 302, 310 (C.A.A.F. 2015) (citing *Cleveland v. United States*, 531 U.S. 12, 25 (2000)) (additional citations omitted). Resort to the rule of lenity, however, is reserved for those situations in which "[a]fter 'seiz[ing] every thing from which aid can be derived,'" a court is "left with an ambiguous statute." *United States v. Bass*, 404 U.S. 336, 347 (1971) (second alteration in original) (quoting *United States v. Fisher*, 6 U.S. 358, 386 (1805)).

Article 120c(a), UCMJ, establishes the three offenses of indecent viewing, recording, or broadcasting, by providing,

> Any person subject to this chapter who, without legal justification or lawful authorization—
>
> (1) knowingly and wrongfully views the private area of another person, *without that other person's consent and under circumstances in which that other person has a reasonable expectation of privacy*;
>
> (2) knowingly photographs, videotapes, films, or records by any means the private area of another person, *without that other person's consent and under circumstances in which that other person has a reasonable expectation of privacy*; or
>
> (3) knowingly broadcasts or distributes any such recording that the person knew or reasonably should have known was made under the circumstances proscribed in paragraphs (1) *and* (2);

13

> is guilty of an offense under this section and shall be punished
> as a court-martial may direct.

10 U.S.C. § 920c(a) (emphasis added).

To prove distribution of an indecent recording in violation of paragraph (3) of Article 120c(a), UCMJ, the Government is required to prove an appellant distributed a recording that the appellant "knew or reasonably should have known was made under the circumstances proscribed in paragraphs (1) [indecent viewing] *and* (2) [indecent recording]" of Article 120c(a), UCMJ. *See* Article 120c(a)(3), UCMJ, 10 U.S.C. § 920c(a)(3) (emphasis added). Appellant relies on the conjunction, "and," to claim that the Government was required to prove the language of indecent viewing under Article 120c(a)(1), UCMJ, and indecent recording under Article 120c(a)(2), UCMJ, in addition to the language in paragraph (3), in order to prove an offense of indecent distribution.

We disagree and conclude the "circumstances proscribed" language in paragraph (3) means recordings made "without that other person's consent and under circumstances in which that other person has a reasonable expectation of privacy," which is language common to paragraphs (1) and (2) of Article 120c(a), UCMJ, and thus explains the conjunction. Our reasoning is illuminated by the language in paragraph (3) that uses the verb "made," and not "viewed" or "made and viewed," to link the act of distribution with the "under the circumstances prescribed in" language at issue.

Even if our plain reading leaves doubt, we find that Article 120c(a)(3), UCMJ, is nevertheless unambiguous. Congress and the President could not have intended we read Article 120c(a), UCMJ, in the unduly restrictive manner Appellant proposes we should. The statute forbids three separate acts—viewing, recording, and broadcasting or distribution of another's private area—that are violations of law when done knowingly and under identically proscribed circumstances. The acts are separated by the disjunctive, "or," in the text of both the header and the substantive paragraphs of the statute.

Appellant's interpretation that prosecutions under Article 120c(a)(3), UCMJ, are limited to situations in which an appellant observes, records and distributes an image of an unsuspecting person would preclude application of the statute to all but the narrowest of circumstances. An appellant who surreptitiously made a video recording of a victim's private area under proscribed circumstances might be found guilty of making an indecent recording, but criminal liability for indecent broadcasting or distribution of that same recording would depend on whether or not the appellant also viewed the private area of the victim at the same time the appellant made the recording. This would be an incongruous result. *King*, 71 M.J. at 52 (citation omitted).

14

We conclude that Appellant's interpretation that would require the Government to prove Appellant viewed KG's private area without her consent as necessary to prove that Appellant then distributed recordings he made of her defies a plain reading of the unambiguous statute.[17] Accordingly, we find that the military judge did not err when she instructed the members on the elements of the offense of distribution of an indecent recording as charged in Specification 2 of Charge II. We further find that Appellant's conviction was not legally insufficient on grounds that the Government was required to prove the elements of indecent viewing in violation of Article 120c(a)(1) and indecent recording in violation of Article 120c(a)(2) in order to prove the offense of distribution of an indecent recording in violation of Article 120c(a)(3).[18]

Appellant's interpretation of Article 120c(a)(3), UCMJ, is also contrary to the elements in the *MCM,* pt. IV, ¶ 45c.b.(4), which the military judge followed in instructing the members, as do we, to determine legal and factual sufficiency of Appellant's conviction. In order for the members to find Appellant guilty of distribution of an indecent recording the Government was required to prove beyond a reasonable doubt: (1) that Appellant knowingly distributed a recording of KG's private area on divers occasions; (2) that the recording was made without KG's consent; (3) that Appellant knew or reasonably should have known that the recording was made without KG's consent; (4) that the recording was made under circumstances in which KG had a reasonable expectation of privacy; (5) that Appellant knew or reasonably should have known that the recording was made under circumstances in which KG had a reasonable expectation of privacy; and (6) that Appellant's conduct was

---

[17] Because we can resolve Appellant's claim by examining the text of the statute itself, we do not address Appellant's theory that Congress, by enacting a new offense, Article 117a, UCMJ, 10 U.S.C. §917a, to the *Manual for Courts-Martial*, *United States* (2019 ed.) (*MCM*),"Wrongful broadcast or distribution of intimate visual images," understood that Article 120c, UCMJ, would not apply to Appellant's conduct. *See* National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115–91, § 533(a), 131 Stat. 1283, 1389 (2017) (enacting Article 117a, UCMJ, 10 U.S.C. § 917a).

[18] Appellant also claims that an appellant cannot be convicted of indecent recording under paragraph (2), discussed *supra*, without the Government also proving a surreptitious indecent viewing under paragraph (1). Appellant cites no authority for this claim, and finding none, we are not persuaded that Appellant's conviction of indecent recording of KG in Specification 1 of Charge II was legally insufficient on these grounds, or on grounds that the military judge failed to properly instruct the members on the elements of the offense.

without legal justification or lawful authorization.[19] *See MCM,* pt. IV, ¶ 45c.b.(4). The term "distribute" means "delivering to the actual or constructive possession of another, including transmission by electronic means." Article 120c, UCMJ, 10 U.S.C. § 920c(d)(5). The terms "private area" and "under circumstances in which that other person has a reasonable expectation of privacy" are defined by statute the same as they were in our analysis of Specification 1 of Charge II above.

As discussed in our analysis of the elements of the offense of indecent recording, *supra*, we find a rational factfinder could have found beyond a reasonable doubt that Appellant made recordings of KG's private area without her consent, element (2), and under circumstances in which KG had a reasonable expectation of privacy, element (4). And, we are convinced that the Government met its burden of proof on these elements. These findings are pertinent to the Government's proof of Specification 2 of Charge II, which we analyze next.

### *i) Appellant Knowingly Distributed Recordings of KG*

Appellant argues the Government failed to introduce direct evidence that he posted the Skype video recordings of KG to the Internet website and attacks the circumstantial evidence that he did. At trial, Appellant raised the possibility that his girlfriend, MC, had the motive to retaliate against Appellant because of his infidelity with KG, and MC had sufficient familiarity and access to Appellant's computers to post the charged recordings of KG online.

For the first time on appeal, Appellant points out that the Government presented no evidence connecting him to the two usernames used to post the three videos online. And, although it was uncontroverted that Appellant was associated with the IP address used to post the recordings online, Appellant argues that the 31 May 2015 "Lease Start" date for the IP address at issue was two weeks after the three videos were posted to the Internet on 17 May 2015. Nevertheless, we "reject Appellant's attempts to cast the lack of conclusive forensic evidence as a fatal flaw," *United States v. King*, 78 M.J. 218, 222 (C.A.A.F. 2019), and find the forensic evidence combined with KG's testimony and Appellant's admissions overcame these doubts.

---

[19] As noted in our analysis of Specification 1 of Charge II, the requirement for an appellant's conduct to be wrongful, i.e., without legal justification or lawful authorization, is not an element listed in the *MCM*, but it is required by statute. *Compare* Article 120c(a), UCMJ, 10 U.S.C. § 920c(a), *with MCM,* pt. IV, ¶ 45c.b.(4).

Appellant argues that the 31 May 2015 "Lease Start" date in the record obtained by the Government from Appellant's Internet service provider shows he could not have posted the recordings 14 days earlier on 17 May 2015. We are not similarly convinced that the factfinder, or this court, could attach the same meaning and weight that Appellant assigns to this evidence. Assuming the lease described in the record was for an IP address as Appellant claims, and not one for equipment such as a modem, router, cable box or other property, we find it to be a reasonable inference that Appellant was nevertheless associated with this IP address two weeks earlier. We reach this conclusion because the record also showed a 17 July 2013 "Install Date," which predated by 22 months the date when images of KG were posted online. Evidence that Appellant maintained a longstanding relationship with the Internet service provider that assigned him the IP address at issue is circumstantial evidence that Appellant was associated with this IP address on 17 May 2015 when other evidence showed that images of KG were posted online. Put differently, evidence of a 31 May 2015 "Lease Start" date, assuming this refers to a lease of an IP address, does not exclude the probability that Appellant used this IP address two weeks earlier. A rational factfinder could have reached this conclusion as well from the evidence admitted at trial even though the significance, or not, of the lease date and other information from Appellant's Internet service provider was not argued by either party at trial.[20] We conclude that the unexplained lease date does not negate the legal or factual sufficiency of the finding of guilty.

Evidence at trial showed that the charged Skype recordings were saved in an area deep in Appellant's computer's folder structure; some filenames were personalized with KG's initials. The forensic evidence supports a reasonable inference that Appellant maintained exclusive control of the recordings when they were in his possession and negates reasonable doubt that someone other than Appellant would have known these recordings existed, much less could have found them and distributed identical copies to a website. This same evi-

---

[20] We similarly reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to use the Government's evidence "to show the IP address used to post the videos of KG did not belong to Appellant on 17 May 2015." Appellant's premise—that there was no direct evidence that Appellant had an IP lease on this date—is correct, but there was circumstantial evidence that he did. We find Appellant has not shown that his counsel were ineffective for failing to use evidence in the manner that Appellant claims they should have, and thus, this issue does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

dence of control, combined with evidence that SS received an anonymous text message to visit a link pointing to identical recordings online supports a reasonable inference that Appellant's relinquishment of control of the recordings was by design and not accident. Even in the absence of direct evidence of how Appellant distributed the recordings of KG to "the actual or constructive possession of another," Article 120c(d)(5), UCMJ, we find that a rational factfinder could conclude that Appellant's exclusive control was circumstantial evidence that he did, and did so purposefully.

Appellant did not specifically admit to posting *video* recordings of KG online, however, we find his admission to KG to posting pictures of her online and Amn HM's testimony that Appellant retaliated against KG by uploading photos of KG to a website established motive and intent to post the charged recordings, even if Appellant's statements fell short of acknowledgements of guilt. We find a rational factfinder could consider Appellant's statements along with KG's testimony and the forensic evidence in the case, and conclude that Appellant knowingly distributed recordings of KG. And, we are convinced that the Government met its burden of proof on this element.

### ii) Appellant Knew or Reasonably Should Have Known the Recordings were Made without KG's Consent

Having already concluded in our analysis of Specification 1 of Charge II that Appellant recorded KG without her consent, we further find Appellant knew that she did not consent. KG testified she and Appellant never discussed his recording her during their Skype sessions, and that she was unaware of, and had not consented, to the recordings. We find a rational factfinder could conclude that KG's testimony proved beyond a reasonable doubt that Appellant knew that KG did not consent to the recordings he made of her. And, we are convinced that the Government met its burden of proof on this element.

### iii) Appellant Knew or Reasonably Should Have Known the Recordings were Made under Circumstances in which KG Had a Reasonable Expectation of Privacy

Having already concluded in our analysis of Specification 1 of Charge II that Appellant recorded KG under circumstances in which she had a reasonable expectation of privacy, we further find Appellant knew this to be the case. The evidence in the record established that Appellant, as the person who surreptitiously made recordings of KG, knew full well the conditions in which he made the charged recordings. Each recording captured KG and no one else in the privacy of her room. Only she and Appellant participated, and even then, Appellant's participation was not recorded. KG not only believed she could disrobe under these circumstances, but did so, and performed sexu-

al acts that are customarily performed in private either alone or with an intimate partner. KG's bare breasts, buttocks, and genitalia were displayed to Appellant and never to the public.[21]

We find these facts establish the requisite knowledge, and we are not persuaded by Appellant's claim that his knowledge of KG's expectation of privacy was diminished because he knew KG sometimes made recordings of herself or that KG was aware and did consent to Appellant recording them together in a prior relationship. We decline the invitation to consider recordings under dissimilar circumstances when evaluating Appellant's knowledge of the circumstances of the charged recordings, which were unique in that Appellant recorded KG during real-time, i.e., "live," Skype sessions in their current relationship.

We find a rational factfinder could conclude that Appellant knew that the recordings he made of KG were under circumstances in which she could disrobe in privacy without concern that her private area was being recorded or visible to the public. Consequently, a rational factfinder could conclude that Appellant knew that the recordings he made of KG were under circumstances in which she had a reasonable expectation of privacy. And, we are convinced that the Government met its burden of proof on this element.

### iv) No Legal Justification or Lawful Authorization

We find a rational factfinder could conclude that Appellant had no legal justification or lawful authorization that would excuse his culpability for distributing recordings of KG without her consent under circumstances in which she had a reasonable expectation of privacy. And, we are convinced that the Government met its burden of proof that Appellant's actions were wrongful.

Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offense of distribution of an indecent recording of KG on divers occasions, as charged in Specification 2 of Charge II, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances

---

[21] We reject the claim by Appellant's counsel that "Appellant is a member of 'the public'" under Article 120c, UCMJ. If Appellant's interpretation were correct, then there would be no "reasonable expectation of privacy" under Article 120c(d)(3)(B), UCMJ, under circumstances when a person knows that her private area is observed by an intimate partner, such as Appellant. We determine that the factfinder could reasonably conclude that the ordinary meaning of "public" in this context did not include Appellant.

for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

**B. Legal and Factual Sufficiency – Indecent Recording of Amn HM (Specification 3 of Charge II)**

Appellant also challenges the legal and factual sufficiency of the finding of guilty to Specification 3 of Charge II, which alleges that Appellant made an indecent recording of Amn HM on divers occasions. We are not persuaded by Appellant's claims and find the conviction is legally and factually sufficient.

**1. Additional Facts**

Appellant and Amn HM were assigned to the same flight and worked in the same office. She testified that in approximately April or May 2015, her personal laptop computer fell off her desk at work and she could no longer access her Career Development Course (CDC) and other files she had saved, including "selfies" and other pictures she had taken with her cell phone camera and had backed up onto her laptop. Appellant told her he could fix her laptop and recover her data, which she agreed to because she did not have the time or money to take it to a repair shop, and knew Appellant had the skills to help her because he had built his own computer. The same day, Amn HM gave Appellant her laptop to repair, and he returned it to her about a week and a half later. She testified the only other person who had worked on her laptop was her uncle, who had installed software for her when she had visited family on Christmas in 2014, before Appellant took her laptop to repair.

When he returned her laptop, Appellant told her that the built-in camera was not working, and he explained to her that he had recovered her files and saved them to a new hard drive. Amn HM testified she could not confirm the camera actually had broken from the fall, but the laptop now displayed a green screen when she tried to use the camera. Amn HM testified that Appellant had replaced her hard drive with a Russian substitute, causing software icons to appear in "Russian," and her laptop was now prone to crashing. For these reasons she gave the laptop back to Appellant a few times to try to fix or at least convert program and file names to English so she could use it. Appellant also accessed her laptop to create a username and password for her and he established Internet access in her dorm room using a nearby connection, although she could not recall if Appellant assisted her with these things before or after she first gave him the laptop to repair.

The AFOSI agents seized Appellant's computers and cell phone on 4 September 2015, after they had interviewed several witnesses who shared a close

20

relationship with Appellant, and four days after agents had interviewed Appellant on 31 August 2015, when he asked to speak to them about matters involving KG. Amn HM was not surprised when AFOSI agents called and wanted to speak with her because she was aware they had been interviewing Appellant's closest friends. While eating lunch in a park with Appellant before her third AFOSI interview, Appellant told her that if the agents looked "deep enough" they might find information on his computer that she had on hers "even though [Appellant had] deleted it."

That afternoon at the interview, Amn HM was surprised when the AFOSI agents showed her pictures they obtained from Appellant's media that showed her in various stages of undress, including pictures showing her bare breasts, in the privacy of her on-base dormitory room. Amn HM recognized the clothes she was wearing in one of the pictures as a bathing suit she wore to a pool party in June 2015, and the picture appeared to have been taken from the vantage of her laptop's built-in camera. Amn HM testified she was unaware of, and did not consent to, the pictures being taken, and she had never used her laptop's camera to take still pictures. Amn HM did not know when the pictures of her would have been recorded, but she knew they would not have been on her laptop when she first gave it Appellant to repair in April or May.

The Government presented expert testimony of a computer forensic analyst who explained that 11 pictures of Amn HM were found on Appellant's personal cell phone in a temporary cache folder used to reload remote images quickly after they had been accessed initially. Each picture was date-stamped 20 June 2015, which the expert explained is the date the software recorded that the picture was taken. All were captured during a four minute interval when Amn HM was changing clothes and partially undressed. Five pictures showed her disrobing. Two captured her unclothed front shoulders and face as she appeared to be looking at her laptop's screen. Four pictures showed her bare breasts and chest and were the charged recordings that the Government introduced into evidence to prove the offense of indecent recording on divers occasions.

The Government expert found installation files for three software programs on one of Appellant's computers which, if installed, would have allowed Appellant to access Amn HM's laptop camera and take pictures with her camera. The expert also found digital evidence in the form of "shellbags" on Appellant's computers that were used to browse files and open subfolders

nested in a folder named, "[H***]'s[22] Laptop" on 6 July 2015 and earlier. The expert explained, "it appeared that somebody would go into [Amn] H[M]'s laptop, browse the files and open up various folders inside of [her] laptop."

Although Amn HM's laptop was not available for forensic analysis, the expert offered his opinion how the charged recordings could have been saved on Appellant's cell phone. He explained that Appellant could have concealed the remote-access programs he had installed on her laptop by labeling them in "Russian" and then accessed her built-in camera over the Internet using her IP address, password, and user account information that he knew from having set up her Internet access. Appellant could have used a file management program that was found on his cell phone to access remote images, which images were cached, i.e., saved, in a file on his phone. Appellant could have later removed the remote access programs while maintaining the installation files for the software on his computer if Appellant wanted to install the programs again. Appellant's girlfriend, MC, testified that Appellant knew how to establish remote, "two way" access with another computer using "Log***," one of the software programs the expert testified was found on Appellant's computer.

**2. Analysis**

In order for the members to find Appellant guilty of indecent recording of Amn HM on divers occasions, as charged in Specification 3 of Charge II, the Government was required to prove beyond a reasonable doubt the same four elements of indecent recording as charged in Specification 1 of Charge II. At trial and on appeal, Appellant claims the evidence is insufficient that he knowingly recorded Amn HM. We disagree.

The Government's case at trial relied on this theory and timeline: Amn HM broke her laptop in April or May 2015, and the charged recordings of her had not yet been captured and so were not on her laptop when she gave it to Appellant to repair. While making repairs initially, or in subsequent attempts, but not later than a pool party sometime in June 2015, Appellant installed software on her laptop and on his computer to remotely capture images using her laptop's built-in camera. Appellant recorded her on 20 June 2015, the date-stamp on the pictures, as Amn HM changed into the bathing suit she would wear to the pool party. Appellant remotely viewed one or more of these images as recently as 6 July 2015 using his cell phone. The Government relied on this timeline to show that Appellant had the means and op-

---

[22] The filename included Amn HM's first name.

portunity to uninstall and erase traces of executable remote access software he had installed on his computers before his media was seized on 4 September 2015. In support of this theory, the Government relied on the testimony of its expert who found software to permanently erase programs and files so that the information could not be discovered.

In findings argument, the Defense discounted evidence that remote-access software installation files were found on Appellant's computer because there was no evidence the software programs had been installed. The Defense also discounted circumstantial evidence that Appellant had the means to remotely access Amn HM's computer, also arguing that Appellant had no motive to record Amn HM, a close friend, without her consent, and the Government presented no direct evidence that Appellant actually did. The Defense further argued that the Government failed to disprove the possibility that Amn HM unwittingly clicked on a feature that caused her camera to automatically take pictures, made probable because of Amn HM's testimony that filenames and programs were displayed in a language she could not understand.

On appeal, Appellant similarly asserts the Government failed to disprove that "glitchy" software loaded on Amn HM's computer by her uncle recorded her before she broke her laptop, and crucially, its built-in camera.[23] Appellant also attempts to discredit the Government's timeline and Amn HM's recollection of events on which its timeline depends. Appellant posits that contrary to her testimony, Amn HM broke her laptop and gave it to Appellant to repair after the 20 June 2015 date-stamp on the charged recordings (assuming the pictures of her had not been captured earlier because the Government failed to prove the date stamp was the correct date). This alternative timeline, Appellant claims, explains how the charged recordings would have been captured before the built-in camera broke from the laptop's fall and before she gave it to Appellant to repair. And, it explains how Appellant would have innocently possessed the recordings as a consequence of recovering and then transferring her data to a new hard drive, and not from installing hidden software on her laptop and remote-access software on his computer as the Government claimed he did.

---

[23] Appellant's counsel avers, "[t]he computer broke when it hit the floor, *breaking the built-in camera*," that the camera was "*still* broken" when Appellant returned the laptop, and that Amn HM "*acknowledged* the camera was *still* broken." (Emphasis added). Although we find these claims to be proper argument, nonetheless, there is no indisputable evidence in the record that the camera was ever broken, much less that it broke from a fall, or that Amn HM acknowledged that it did.

We again "reject Appellant's attempts to cast the lack of conclusive foren-sic evidence as a fatal flaw," *King*, 78 M.J. at 222, and find Amn HM's testi-mony, combined with the forensic evidence, overcame these doubts. Amn HM testified that she gave her laptop to Appellant to repair in April or May 2015, and had received it back from him before she was recorded changing clothes for a June pool party. The 20 June 2015 date-stamps on the pictures corrobo-rate Amn HM's testimony that the pictures of her were captured as she pre-pared for the party, and after she gave her laptop to Appellant to repair.

We find Amn HM's recollection of when these events occurred negates Appellant's contention that he innocently came into possession of the four charged recordings that were captured in late June before she gave him her laptop to repair. Appellant knew how to remotely access a computer. Appel-lant had installation files for three software programs he needed to remotely access another computer and then take pictures with her laptop's built-in camera.[24] His cell phone, where the charged recordings were found, contained a file management program that saved cached copies of the 11 pictures he had previously recorded and accessed.

While we have the independent authority and responsibility to weigh the credibility of Amn HM in determining factual sufficiency, we recognize that the factfinder saw and heard her testimony. *Moss*, 63 M.J. at 239. We find the circumstantial evidence supports the Government's timeline and Amn HM's testimony on which it depends. The evidence supports a reasonable in-ference that Appellant accessed the camera in Amn HM's laptop to record pictures of her after he returned the laptop to her as early as April or May, and not later than early June 2015. The nature of the 11 pictures found in Appellant's cell phone's cache, including the four charged recordings, all date-stamped 20 June 2015 during a four-minute period, is highly suggestive of deliberate human involvement. The circumstantial evidence supports a rea-

---

[24] We reject Appellant's claim raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that his trial defense counsel were ineffective for failing to demonstrate in court that one of the software programs found on his computer, "Log***," "cannot be used to remotely access another computer," as Appellant's girl-friend suggested it could. We find counsel were not ineffective because this testimony was not sufficiently developed to contrast with Appellant's position on appeal, and because the Government's expert explained he found installation files for three pro-grams that needed to be installed in order to gain access to Amn HM's computer "and another program," "Log***," which the expert dismissed because, in his words, "I don't know what it did." Thus, this claim does not require further discussion or war-rant relief. *See Matias*, 25 M.J. at 361.

sonable inference that Appellant purposefully viewed one or more of these images using his cell phone as late as 6 July 2015.[25] All the pictures showed Amn HM either partially nude or disrobing. We agree with the Government that the selective nature of these 11 recorded pictures contradicts Appellant's theory at trial, and his alternative timeline on appeal, that her "glitchy," possibly virus-laden, computer took indecent pictures of her on its own or perhaps owing to software installed by Amn HM's uncle, and that Appellant could have innocently come into possession of the recordings during a file transfer to repair her laptop.[26]

We further find that Appellant had no legal justification or lawful authorization for recording Amn HM without her consent under circumstances in which she had a reasonable expectation of privacy. Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found beyond a reasonable doubt all the elements of the offense of indecent recording of Amn HM on divers occasions, as charged in Specification 3 of Charge II, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt be-

---

[25] We reject Appellant's claim raised pursuant to *Grostefon*, that his trial defense counsel were ineffective for failing to use their interview notes of the Government's expert who purportedly claimed in an interview with trial defense counsel that on 6 July 2015, Appellant "had to have seen all of the images of Airman HM" in order for them to be in the temporary cache folder on Appellant's phone. Appellant suggests these notes confirm his theory that Amn HM broke her computer sometime around the end of June-beginning of July timeframe, and not in April-May 2015 as Amn HM claimed she did. In fact, the interview notes state, "7/6/2015 is when these selfies were viewed." It is clear from the record that the selfies saved on Amn HM's computer were different from the 11 pictures found in his cell phone's cache, including the four charged recordings. Thus, this claim does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

[26] We similarly reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to challenge the Government's timeline with two text messages that AFOSI agents recovered from his cell phone. One message Appellant sent to Amn HM's supervisor on 15 July 2015 about her completing her CDCs, and the second message, dated 27 July 2015, referenced a pool party that evening. We find counsel were not ineffective because neither was material to challenging the Government's timeline, and thus, does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

yond a reasonable doubt. Therefore, we find Appellant's conviction of Specification 3 of Charge II both legally and factually sufficient.

## C. Challenges to the Findings Instructions

Appellant challenges the findings instructions and argues for the first time on appeal that the military judge erred in her instructions to the members on the elements with respect to the indecent recording offense involving KG (Specification 1 of Charge II).[27] Specifically, Appellant contends the military judge failed to give the members an instruction on a *mens rea* requirement for the "consent" and "reasonable expectation of privacy" elements of indecent recording charged as a violation of Article 120c(a)(2), UCMJ. Additionally, Appellant contends the military judge failed to instruct the members that they could find Appellant not guilty of Specifications 1 and 2 of Charge II involving KG if Appellant labored under a mistaken belief as regards KG's lack of consent and her reasonable expectation of privacy. We are not persuaded the military judge erred.

### 1. Additional Background

KG testified that at one time Appellant had made sexual videos of them appearing together, which she had consented to him recording. These videos were not made in their current long-distance relationship, but were made toward the end of a prior intimate relationship, between September 2007 and May 2011, before she graduated from high school and before they began dating again in December 2013. She explained these videos were different from the charged recordings that Appellant made of her between January and August 2014 in that they appeared together. As discussed previously, in their current relationship, KG sometimes sent Appellant sexual pictures and videos she recorded on her laptop computer. Usually at Appellant's request, KG e-mailed Appellant these photos or transmitted video files too big to email as an attachment using a feature in Skype. Unlike the charged recordings, these video files were dissimilar in that KG made the recordings herself and transmitted them to Appellant at a later time.

At the close of evidence, Appellant did not request, and the military judge did not give, an instruction that would have included a *mens rea* requirement

---

[27] At first blush, Appellant's assignment of error asks that we examine the *mens rea* requirement without limitation, presumably encompassing the impact of the claimed failure to instruct with regard to the indecent recording offenses involving both KG (Specification 1 of Charge II), and Amn HM (Specification 3 of Charge II). However, Appellant's brief—and consequently our opinion—addresses only the former offense.

for the "consent" and "reasonable expectation of privacy" elements of the indecent recording offense involving KG. Instead, the military judge instructed on these elements as they appear in the *MCM,* pt. IV, ¶ 45c.b.(2), and the Military Judges' Benchbook.[28]

Appellant also did not request, and the military judge did not give, a mistake-of-fact instruction with respect to either element for either offense involving KG. Appellant did not object to the findings instructions when they were examined by the parties in an Article 39(a), UCMJ, session, after the close of evidence, and did not object when the military judge instructed the members.

### 2. Law

"The mens rea applicable to an offense is an issue of statutory construction, reviewed de novo." *United States v. McDonald*, 78 M.J. 376, 378 (C.A.A.F. 2019) (citation omitted). Whether a required instruction on findings is reasonably raised by the evidence is a question of law reviewed de novo, as well. *United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (citations omitted). Because there was no objection to the instructions at trial, we review for plain error. *United States v. Haverty*, 76 M.J. 199, 208 (C.A.A.F. 2017) (citation omitted). Under a plain error analysis, "Appellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of [Appellant]." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (citation and footnote omitted).

"A military judge is required to instruct members on any affirmative defense that is 'in issue,' and a matter is considered 'in issue' when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose.'" *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)); *see also* R.C.M. 920(e)(3). Some evidence can be raised "by evidence presented by the defense, the prosecution, or the court-martial." *United States v. Hibbard*, 58 M.J. 71, 73 (quoting R.C.M. 916(b), Discussion). If shown by some evidence, mistake of fact is a defense. It requires that an appellant hold, due to "ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the [appellant] believed them, the [appellant] would not be guilty of the offense." R.C.M.

---

[28] Dept. of the Army Pamphlet 27–9 at 629–31 (10 Sep. 2014).

916(j)(1). To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See id.*

### 3. Analysis

#### a. Mens Rea Not Required for the Consent and Reasonable Expectation of Privacy Elements of Indecent Recording

Appellant argues it was not enough that the military judge instructed the members that to find Appellant guilty they must find Appellant made recordings of KG without her consent and under circumstances in which she had a reasonable expectation of privacy. In addition, Appellant contends, the decision by the United States Supreme Court in *Elonis v. United States*, 135 S. Ct. 2001 (2015), required the military judge to instruct that Appellant must have knowledge of the facts alleged in these elements to convict. We are not persuaded.

In *Haverty*, 76 M.J. 199, the CAAF examined *Elonis* and observed "if a court determines that Congress intended, either expressly or impliedly, to have a particular mens rea requirement apply to a certain criminal statute, then the court must construe that statute accordingly." *Id.* at 204 (citations omitted). It is only if "a statute is silent regarding a mens rea requirement" and "if a court cannot discern the legislative intent in regard to that statute" that the court will then "infer a mens rea requirement." *Id.*

We find no reason to infer a *mens rea* requirement. The military judge gave the members the mandatory instructions for the charged offenses. R.C.M. 920(e)(1). As properly instructed by the military judge, Article 120c(a)(2), UCMJ, requires that an appellant *knowingly* record by any means the private area of another person to convict. The military judge explained to the members in her findings instructions that "[a]n act is done knowingly when it is done intentionally and on purpose. An act done as the result of a mistake or accident is not done knowingly." Furthermore, the presence of a "knew or reasonably should have known" *mens rea* in Article 120c(a)(3), UCMJ, for these same elements suggests that Congress affirmatively chose not to include identical *mens rea* requirements in Article 120c(a)(2), UCMJ. Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (citation and internal quotation marks omitted).

We discern Congress intended Article 120c(a)(2), UCMJ, to have one knowledge *mens rea* requirement as the military judge instructed, and no others, and we must construe the statute accordingly. *Haverty*, 76 M.J. at 204. Consequently, the military judge did not err in failing to instruct on a

knowledge *mens rea* requirement to the "consent" and "reasonable expectation of privacy" elements of the indecent recording offense involving KG.

### b. Mistake of Fact as to Consent

Appellant did not request and the military judge did not *sua sponte* give a mistake-of-fact instruction with respect to the element that the recordings Appellant made of KG were without her consent. Appellant argues that even if KG did not consent to Appellant making recordings of her during their Skype sessions, the military judge erred because there was some evidence Appellant had an honest and reasonably mistaken belief that KG did consent. It follows, Appellant argues, that the military judge was obligated to instruct the members accordingly as to both the offense of indecent recording and distribution of an indecent recording in Specifications 1 and 2, respectively, of Charge II, because both offenses share this common element. We disagree.

Assuming *arguendo* that mistake of fact can be an affirmative defense to the lack of consent element common to both specifications, we nevertheless find there is no evidence Appellant held an honest belief that KG consented to the charged recordings, much less that Appellant reasonably believed that she did. There is no evidence in the record, for example, that KG ever permitted Appellant to record her when she was unaware he was doing so, or invited Appellant to record her at his leisure, or that she had ever manifested approval after the fact upon learning he had recorded her when she was initially unaware and had not initially given her consent.

We distinguish this case from "mixed message" cases where the mistake of fact defense is raised because of prior consensual sexual contact between two individuals. *See, e.g., United States v. DiPaola*, 67 M.J. 98, 101–02 (C.A.A.F. 2008). Appellant avers KG was aware and consented to sexual recordings on other occasions when she was not using Skype to converse with Appellant; however, consent given under different circumstances on some occasions did not make it reasonable for Appellant to believe that KG had given her consent at other times. KG testified she never discussed with Appellant whether it would be appropriate for him to record her during their Skype sessions, and she never gave him permission to do so. The occasions when KG made recordings of herself, which she was obviously aware, are not equivalent to the charged recordings when she was not. We find no evidence in the record that KG ever consented to *Appellant* making recordings of her in their current relationship, and therefore we find no opportunity for Appellant to mistake recordings that "were off-limits" from those that "were permissible." *Id.* at 101.

On these facts, we decline to find that recordings KG made herself and sent to Appellant—or that Appellant made of them together in a prior rela-

tionship—provided any "mixed message" to Appellant that caused him to believe he had her permission to surreptitiously record her private area. Consequently, we find no evidence in the record that Appellant held either an honest or reasonable belief that KG had consented to the Skype recordings. Thus, we find no plain error by the military judge in failing to give a mistake-of-fact instruction as to consent for either specification.

### c. Mistake of Fact as to Reasonable Expectation of Privacy

Appellant did not request and the military judge did not *sua sponte* give a mistake-of-fact instruction with respect to the element that the recordings Appellant made of KG were under circumstances in which KG had a reasonable expectation of privacy. Appellant argues that even if his recordings of KG were made under circumstances in which KG had a reasonable expectation of privacy, the military judge erred because there was some evidence Appellant had an honest and reasonable mistaken belief that KG had no reasonable expectation of privacy at the time the Government claimed he made recordings of her. It follows, Appellant argues, that the military judge was obligated to *sua sponte* instruct the members accordingly as to both the offense of indecent recording and distribution of an indecent recording in Specifications 1 and 2, respectively, of Charge II, because both offenses share this common element. We disagree.

Assuming *arguendo* mistake of fact can be an affirmative defense to the reasonable expectation of privacy element common to both specifications, we nevertheless find that there was no evidence presented at trial from which it may be inferred that Appellant labored under a mistaken belief that KG did not have a reasonable expectation of privacy when he made recordings of her during their Skype sessions. Appellant knew that KG's private area was visible to the two of them, and no others. Appellant alone knew that he was recording KG's private area. There is no evidence that KG would agree to showing her private area to anyone other than an intimate partner, i.e., to the public, much less that Appellant believed this to be so. While KG was aware of and consented to sexual recordings Appellant made of her in the past, no reasonable factfinder could infer that Appellant held a mistaken belief of KG's privacy expectations during their private Skype sessions when she alone was recorded. We find no evidence in the record that Appellant held either an honest or reasonable belief that KG did not have a reasonable expectation of privacy when he would record her during their Skype sessions. Thus, we find no plain error by the military judge in failing to give a mistake-of-fact instruction on this element for either specification.

We conclude the military judge did not err in her findings instructions to the members by failing to attach a *mens rea* requirement to the "consent" and

"reasonable expectation of privacy" elements of indecent recording, and Appellant was not entitled to a mistake-of-fact instruction as to these elements.[29]

### D. The Military Judge Did Not Err in Failing to *Sua Sponte* Enter a Finding of Not Guilty to Specifications 1 and 2 of Charge II

Appellant contends on appeal the military judge erred in failing to *sua sponte* enter a finding of not guilty to the indecent recording and distribution of an indecent recording offenses involving KG as charged in Specification 1 and 2 of Charge II.[30] We are not persuaded.

We review whether a military judge "correctly understood and applied a legal concept de novo." *United States v. Hughes*, 48 M.J. 214, 216 (C.A.A.F. 1998) (citations omitted) (no error denying appellant's motion for a finding of not guilty). Rule for Courts-Martial 917 requires the military judge, on motion by the accused or *sua sponte*, to enter a finding of not guilty "if the evidence is insufficient to sustain a conviction." R.C.M. 917(a). The military judge grants a motion for a finding of not guilty "only in the absence of some evidence which, together with all reasonable inferences and applicable presumptions, could reasonably tend to establish every essential element of an offense charged." R.C.M. 917(d). The military judge views the evidence "in the light most favorable to the prosecution, without an evaluation of the credibility of witnesses." *Id.*

For the reasons given in our determination of legal sufficiency, we find the military judge did not err by declining to *sua sponte* find Appellant not guilty of Specifications 1 and 2 of Charge II. Viewing the evidence in the light most favorable to the Government without an evaluation of the witnesses' credibility, we find there was some evidence at the close of the Government's case which could reasonably tend to establish every essential element of Specifications 1 and 2 of Charge II. Furthermore, given our conclusion, *supra*,

---

[29] We similarly reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to ask for an instruction regarding Appellant's mistake of fact regarding consent and KG's reasonable expectation of privacy. We find counsel were not ineffective because of the absence of some evidence admitted at trial, which raised the defense, and thus, this issue does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

[30] Appellant's assignment of error alleges the military judge's failure was only with respect to "wrongful broadcasting," but Appellant's brief addresses both the offense of indecent recording (Specification 1 of Charge II) and *distribution* of an indecent recording (Specification 2 of Charge II), as do we.

that there was no requirement for the Government to prove an indecent viewing as necessary to prove an indecent recording or distribution of an indecent recording, we find the military judge was not obligated to *sua sponte* enter a finding of not guilty of Specifications 1 and 2 of Charge II.

Accordingly, we find that the military judge did nor err by failing to *sua sponte* enter a finding of not guilty under R.C.M. 917.[31]

## E. Constitutional Challenges to Article 120c(a)(2), UCMJ

Appellant asserts as a single assignment of error that "the crime of indecent visual recording is unconstitutionally vague and overbroad on its face and as applied to Appellant." As styled, Appellant's facial and "as-applied" claims are not specific to the indecent recording offense involving either KG or Amn HM; however, Appellant's brief in support of his assignment of error is specific to his conviction of indecent recording of KG, and, consequently, so is our analysis and decision.

Accordingly, we separately address Appellant's facial and as-applied challenges to his conviction of Specification 1 of Charge II in violation of Article 120c(a)(2), UCMJ, on grounds of unconstitutional vagueness, and then we address Appellant's challenge to his conviction on grounds of unconstitutional overbreadth. We are not persuaded that Article 120c(a)(2), UCMJ, is unconstitutionally vague or overbroad.

### 1. Law

We review the constitutionality of a statute de novo. *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012) (citing *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005)). Because Appellant did not claim at trial that Article 120c(a)(2), UCMJ, is unconstitutional as applied, under a plain error review "Appellant must point to particular facts in the record that plainly demonstrate why his interests should overcome Congress' and the President's determinations that his conduct be proscribed." *United States v. Goings*, 72 M.J. 202, 205 (C.A.A.F. 2013) (citations omitted).

---

[31] Appellant's counsel claims as part of the assignment of error that, in the alternative, trial defense counsel were ineffective for failing to move for a finding of not guilty of both specifications involving KG. Specifically, counsel avers that "[a] motion for finding of not guilty would have been successful, and Appellant would not now be convicted." We find counsel were not ineffective because the motion did not have merit, and thus, this issue does not require further discussion or warrant relief. *See Matias*, 25 M.J. 361.

The Due Process Clause of the Fifth Amendment[32] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Due process "also requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)). A void for vagueness challenge requires inquiry into whether a reasonable person in Appellant's position would have known that the conduct at issue was criminal. *See, e.g.*, *Vaughan*, 58 M.J. at 31 (upholding a conviction under Article 134, UCMJ, for leaving a 47-day-old child alone on divers occasions for as long as six hours; while Article 134 did not specifically list child neglect as an offense, the appellant "should have reasonably contemplated that her conduct was subject to criminal sanction, and not simply the moral condemnation that accompanies bad parenting."); *United States v. Sullivan*, 42 M.J. 360, 366 (C.A.A.F. 1995) (citation omitted) ("In our view, any reasonable officer would know that asking strangers of the opposite sex intimate questions about their sexual activities, using a false name and a bogus publishing company as a cover, is service-discrediting conduct under Article 134."), *overruled on other grounds by United States v. Reese*, 76 M.J. 297, 302 (C.A.A.F. 2017).

In addition, due process requires that criminal statutes be defined "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted). This "more important aspect of the vagueness doctrine" requires that the statute "establish minimal guidelines to govern law enforcement" rather than "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 358 (alteration in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 574–75 (1974)).

A statute is overbroad under the First Amendment,[33] and therefore unconstitutional, if "it prohibits a substantial amount of protected speech." *United States v. Williams,* 553 U.S. 285, 292 (2008); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). The challenged statute's overbreadth must be substantial, not only in the absolute sense, but also relative to its

---

[32] U.S. CONST. amend. V.

[33] U.S. CONST. amend. I.

plain sweep. *Williams*, 553 U.S. at 292 (citations omitted). Appellant bears the burden of demonstrating substantial overbreadth exists from the text of the statute and the facts of the case. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (citation omitted). The United States Supreme Court has repeatedly recognized that the overbreadth doctrine is "strong medicine" and has, therefore, applied it sparingly. *See New York v. Ferber,* 458 U.S. 747, 769 (1982) (citation omitted).

### 2. Analysis

#### a. Vagueness Challenges

Appellant claims that his convictions of indecent recording of KG in Specification 1 of Charge II is unconstitutional because Article 120c(a)(2), UCMJ, does not provide fair notice that Appellant's acts were subject to criminal sanction. We disagree and address Appellant's facial and as-applied vagueness challenges in turn.

In support of Appellant's facial challenge to Article 120c(a)(2), UCMJ, Appellant renews his concerns that the elements of "consent" and "reasonable expectation of privacy" contain no *mens rea* requirement and, it follows, the statute is constitutionally infirm after the decision of the United States Supreme Court in *Elonis*, 135 S. Ct. 2001. Appellant argues the absence of a *mens rea* requirement for these elements "criminalize[s] 'a broad range of apparently innocent conduct' and [sweeps] in individuals who had no knowledge of the facts that made their conduct blameworthy," citing *Elonis*, 135 S. Ct. at 2009 (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)). In *Elonis*, the Court concluded that simple negligence was insufficient to support a conviction for communicating a threat where the statute in question was silent as regards the requisite *mens rea. Id.* at 2012–13. The CAAF has recognized that where a criminal statute is silent, "the Supreme Court has repeatedly inferred a *mens rea* requirement in instances where it was necessary to separate wrongful conduct from otherwise innocent conduct." *United States v. Gifford*, 75 M.J. 140, 143 (C.A.A.F. 2016) (quoting *Elonis*, 135 S. Ct. at 2010) (internal quotation marks omitted).

We do not share Appellant's concern that an individual would be convicted for apparently innocent conduct. Article 120c(a)(2), UCMJ, is not silent as to *mens rea*. The Government was required to prove Appellant knowingly and wrongfully recorded KG's private area. We find the *mens rea* along with the Government's burden to prove Appellant's act of recording was without KG's consent and under circumstances in which KG had a reasonable expectation of privacy is sufficient to separate innocent acts from wrongful conduct, and provides "fair notice" what acts are forbidden and subject to criminal sanction. *Vaughan*, 58 M.J. at 31.

We also find Article 120c(a)(2), UCMJ, is not unconstitutional as applied to Appellant's conviction for indecent recording of KG. Appellant claims the definition of "reasonable expectation of privacy," Article 120c(d)(3)(A), UCMJ,[34] is unconstitutionally vague as applied to Appellant given his and KG's history of consensual recording and practice of sharing intimate videos and pictures. We disagree. In doing so we recognize that sexual acts, done in private by consenting adults, may be protected by the liberty interest identified in *Lawrence v. Texas*, 539 U.S. 558 (2003), as Appellant points out. But the fact that KG exchanged consensually made, intimate video recordings with Appellant in the past where she willingly displayed her private area does not excuse Appellant recording her private area without her knowledge or consent at other times. Therefore, we find that a reasonable person in Appellant's position would have known that the conduct at issue was criminal. *Vaughan*, 58 M.J. at 31. Thus, we conclude that there was no error, plain or otherwise, and reject Appellant's facial and as-applied challenges to Article 120c(a)(2), UCMJ, on vagueness grounds.

### b. First Amendment Challenge

We similarly find unconvincing Appellant's assertion that his conviction of indecent recording of KG, as charged in Specification 1 of Charge II, should be set aside because Article 120c(a)(2), UCMJ, is unconstitutionally overbroad on the ground that a prosecution for its violation would infringe upon a right to free speech protected by the First Amendment.

We recognize "[t]he traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *See Ferber*, 458 U.S. at 767 (citations omitted). The overbreadth doctrine is "one of the few exceptions" to this rule of limited standing, and allows a person to "attack [an] overly broad statute[ ] even though the conduct of the person making the attack is clearly unprotected." *Id*. at 769. Even though this doctrine allows an appellant to raise the consti-

---

[34] Appellant's reply brief expands the list of words in the statute he avers to be vague and ambiguous to include "privacy" and "public" as they appear in the definition of the phrase "under circumstances in which that other person has a reasonable expectation of privacy," in Article 120c(d)(3)(A) and (B), UCMJ, respectively. We disagree and find the members could afford these words their ordinary meaning without unfair prejudice to Appellant. Not every word in a specification requires definition, even when the word is essential to an element of the offense. *See United States v. Glover*, 50 M.J. 476, 478 (C.A.A.F. 1999).

tutionally protected expressions of others, "'[w]here conduct and not merely speech is involved' the overbreadth must 'not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Parker v. Levy*, 417 U.S. 733, 760 (1974) (quoting *CSC v. Letter Carriers*, 413 U.S. 548, 615 (1973)).

Appellant claims constitutional protection for his recording videos of KG on overbreadth grounds by advocating that Article 120c(a)(2), UCMJ, "criminalizes private sexual conduct between two consenting adults," claiming that the statute infringes on "their First Amendment rights to record their private[,] consensual sexual conduct" and then "share those recordings with each other for their subsequent 'viewing pleasure.'" We are not persuaded. The statute specifically excludes from criminal liability those recordings made with another's consent even though the recording may have been made under circumstances where another has a reasonable expectation of privacy, thus removing Appellant's "two consenting adults" application from First Amendment concern. Here, there was mutual consent only regarding the sexual conduct, not the recording of that conduct.

Furthermore, we are not convinced that prosecutions under Article 120c(a)(2), UCMJ, would "chill the exercise of expressive activity," *Ferber,* 458 U.S. at 772, of an adult in a long-distance intimate relationship. Appellant recorded KG's sexual conduct, not his own, and certainly not "their" own conduct with each other. Even the speech in the charged recordings belongs exclusively to KG other than the faint sound of a low-pitch, muffled voice that is presumably the sound of Appellant conversing with KG, though no words can be discerned. Whether Appellant intended the recordings he made of KG for both their viewing pleasure—as he asserts on appeal—or Appellant's own, no evidence was presented of Appellant's intent, and there is no evidence that KG consented to making any of the charged recordings, much less any specific uses of them. We can conceive of no implication to rights guaranteed by the First Amendment by attaching a criminal conviction to the nonconsensual recording of sexually expressive activity in a private setting in the manner in which Article 120c(a)(2), UCMJ, proscribes, even though the underlying expression involves a willing adult. For these reasons we find that Appellant has failed to demonstrate from the text of the statute and the facts of the case that Article 120c(a)(2), UCMJ, is unconstitutionally overbroad. *Hicks*, 539 U.S. at 122 (citation omitted).

### c. Liberty Interest

Appellant also claims his recording of KG during their "private, consensual" Skype sessions is not prosecutable because Appellant's conduct "fell within the liberty interest" of *Lawrence*, 539 U.S. at 558, and *United States v.*

*Marcum*, 60 M.J. 198, 207–08 (C.A.A.F. 2004) (no liberty interest for a superior to engage in a sexual relationship with a subordinate).[35] We are not persuaded by Appellant's as-applied challenge to his conviction of indecent recording of KG. *Lawrence* involved "two adults who, with full and mutual consent from each other," engaged in sexual intimacy in private. *Lawrence*, 539 U.S. at 578. In contrast, this case involves nonconsensual recordings Appellant made of KG's private area under circumstances in which she had a reasonable expectation of privacy.

We decline to place Appellant's conduct of recording KG without her consent "on par with the liberty interest and fundamental right to form intimate, meaningful, and personal bonds that manifest themselves through sexual conduct described in *Lawrence*." *United States v. Meakin*, 78 M.J. 396, 403 (C.A.A.F. 2019) (rejecting "argument that distributing or transmitting obscenity that encourages, describes, and revels in the sexual exploitation of children over the internet falls within the fundamental liberty interest recognized in Lawrence."). Thus, we conclude Appellant's conduct was qualitatively different and fell outside the liberty interest identified by the United States Supreme Court in *Lawrence*.

We are not persuaded to find any constitutional infirmity to criminalizing the nonconsensual recording of the private area of another person under circumstances in which the person has a reasonable expectation of privacy. Accordingly, we conclude that Appellant has not plainly demonstrated that his conviction of indecent recording of KG, as charged in Specification 1 of Charge II in violation of Article 120c(a)(2), UCMJ, is unconstitutional on grounds that the statute is vague or overbroad.[36] We reach the same conclu-

---

[35] Appellant raised the issue in the context of claiming his conviction of Specification 1 of Charge II was legally and factually insufficient because, Appellant claims, he had legal authorization to record KG. However, "[w]hether an act . . . is legal or illegal [in relation to a constitutional or statutory right of an accused] is a question of law, not an issue of fact for determination by the triers of fact." *United States v. Harvey*, 67 M.J. 758, 763 (A.F. Ct. Crim. App. 2009) (alteration in original) (citation omitted) (*Marcum* factors for determining if an appellant has a constitutional as-applied liberty interest are questions of law and not de facto elements to be instructed on and determined by the members).

[36] We reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to challenge the constitutionality of Article 120c, UCMJ, "related to the specifications involving KG." Appellant's counsel argues that Appellant was denied the opportunity to lose this challenge at trial, and consequently, was prejudiced by having to argue "the more difficult *de novo* 'plain error' standard" on appeal and not "the easier *de novo* standard of review instead."

*(Footnote continues on next page)*

sions with respect to Appellant's conviction of indecent recording of Amn HM, also charged as a violation of Article 120c(a)(2), UCMJ.

## F. Challenges to Trial Counsel's Findings Argument

Appellant asserts trial counsel engaged in prosecutorial misconduct during his findings argument, including rebuttal. Specifically, Appellant alleges trial counsel: (1) misstated the law in his recitation of the elements of the offense of distribution of an indecent recording; (2) improperly commented on Appellant's constitutional right to defend himself; (3) inappropriately disparaged Appellant and his defense counsel; (4) argued the members consider facts not in evidence and view evidence on the Internet; (5) mischaracterized and improperly vouched for evidence; and (6) unconstitutionally shifted the burden of proof to Appellant to prove his innocence by referring to Appellant's failure to produce Amn HM's broken computer. We find the complained of portions of trial counsel's argument, none of which were objected to by trial defense counsel, were not plain error.

### 1. Law

Prosecutorial misconduct and improper argument are questions of law that we review de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)). Because there was no objection at trial Appellant has forfeited the right to challenge the issue on appeal and we review the propriety of trial counsel's argument for plain error. *Id.* (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)). The burden of proof under plain error review is on Appellant. *Id.* (citation omitted). To prevail under a plain error analysis, Appellant must show "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). We recognize that "it is . . . improper for a trial counsel to attempt to win favor with the members by maligning defense counsel." *Fletcher*, 62 M.J. at 181 (citations omitted).

---

We find this issue identified by Appellant's counsel does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

However, not every improper comment by the prosecution is a constitutional violation. *See generally*, *United States v. Webb*, 38 M.J. 62, 65 (C.M.A. 1993) (citation omitted). Instead, we evaluate the comment in the context of the overall record and the facts of the case. *Id*. The United States Supreme Court has observed that "[i]t is important that both the defendant and prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *United States v. Robinson*, 485 U.S. 25, 33 (1988). A trial counsel is permitted to make a "fair response" to claims made by the defense, even where a constitutional right is at stake. *Id*. at 32; *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001) (citation omitted).

In assessing prejudice, we evaluate the cumulative impact of any prosecutorial misconduct on Appellant's substantial rights and the fairness and integrity of his trial. We do so by balancing three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Fletcher*, 62 M.J. at 184. We also recognize that the lack of defense objection is some measure of the minimal prejudicial impact of the trial counsel's argument. *Gilley*, 56 M.J. at 123 (citation omitted). In sum, "reversal is warranted only 'when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *Sewell*, 76 M.J. at 18 (quoting *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014)).

### 2. Analysis

#### a. *Recitation of the Elements of the Offense of Distribution of an Indecent Recording*

Appellant claims that trial counsel twice misstated the law when he argued the elements of the offense of distribution of an indecent recording, as charged in Specification 2 of Charge II. We disagree.

Appellant first claims that trial counsel eliminated the *mens rea* requirement that Appellant "knew or reasonably should have known" that KG did not consent to the making of the recording that Appellant distributed and, second, that under the circumstances at the time of the recording, KG had a reasonable expectation of privacy. During argument, trial counsel displayed slides that showed the required *mens rea* applicable to each of these elements. The slides properly recited the elements that required proof of identical *mens rea*; however, trial counsel did not repeat the *mens rea* after having stated it once.

After the close of evidence and before findings argument by counsel, the military judge instructed the members they "must resolve the ultimate question of whether the accused is guilty or not guilty based upon the evidence

presented here in court and upon the instructions" as given by the military judge. After properly instructing on the elements of the offenses, the military judge informed the members that the parties may refer to her instructions during argument and that "any inconsistency between what counsel have said about the instructions and the instructions which I give you" must be resolved by accepting the instructions "as being correct."

We find trial counsel did not misstate the elements of the offense of distribution of an indecent recording, and his recitation of the elements together with his visual aid were accurate. Even if we were to consider trial counsel's argument without benefit of the visual aid as Appellant implies we should, we would nonetheless conclude that the military judge's charge to the members to follow her recitation of the elements was a prophylactic measure that minimized the impact of any apparent inconsistency between what trial counsel said on the one hand, and what his slides showed and the military judge instructed on the other.

Appellant also claims that, during rebuttal, trial counsel "misstated the law by shifting KG's consent to consent to distribution instead of consent to being recorded." During rebuttal, trial counsel highlighted evidence that KG knew the difference between videos she consented to Appellant recording where Appellant appeared with KG from the charged videos where Appellant did not appear and she did not consent to him recording. Trial counsel then referred to evidence that KG was also unaware Appellant had posted video recordings of her to the Internet. He argued, "And certainly, she didn't consent in May of 2015 for [Appellant] to put videos and post videos of her online."

Although the Government had no obligation to prove that KG did not consent to Appellant distributing the charged recordings, we find trial counsel did not misstate the law, or shift its burden to prove that KG did not consent from the element of making a recording to the element of distribution of the recording. Instead trial counsel was making the point that Appellant never communicated with KG and sought her permission to post the recordings of her online in the same manner that Appellant did not seek her permission to record KG in the first place.

We find trial counsel did not misstate the elements of the offense of distribution of an indecent recording. His recitation of the elements along with his visual aid, were accurate. Trial counsel did not misstate the law in the manner in which he argued that KG did not consent to Appellant posting the charged recordings of her to the Internet. Consequently, there was no error, plain or otherwise.

### b. Comments about Appellant's Findings Argument

Appellant claims trial counsel improperly commented on Appellant's constitutional right to defend himself by arguing in rebuttal, "Defense got up here and obviously tried to talk themselves out of everything. Apparently, their client is not currently responsible for anything in this case. He didn't do anything wrong," and, again, that "the [D]efense tries to talk their way out of it."

We view these comments as permissible argument suggesting that the Defense findings argument was not persuasive or worthy of serious consideration, and was proper rebuttal to the Defense claim that Appellant had no culpability and should be found not guilty. In contrast to the prohibition against maligning defense counsel, we find trial counsel's argument was a "fair response" to claims made by the Defense, even where a constitutional right to present a defense was at stake. *Cf. Robinson*, 485 U.S. at 32. We conclude trial counsel's argument was not error, plain or otherwise.

### c. Comments Characterizing Appellant's Claims and Defense

Appellant argues that trial counsel impermissibly argued multiple times that Appellant's defense was "ridiculous." At times, trial counsel reminded the members of Appellant's report to his first sergeant and AFOSI investigators that KG sexually assaulted him by inserting a wine bottle into his anus. Appellant invented this allegation, trial counsel implied, to deflect the AFOSI investigation from allegations that Appellant sexually and physically abused KG to his own claim of being a victim. Trial counsel argued that Appellant's claim was false by asking rhetorically, "How ridiculous is that story?" and argued on six separate occasions that Appellant made up a "ridiculous" account of his own sexual assault. We find trial counsel's argument was not an improper personal attack on Appellant, but was permissible commentary on the evidence even if it was debatably ill-phrased. We find trial counsel did not argue that Appellant or his defense was ridiculous, but rather, argued that Appellant's account of what happened to him was unworthy of serious consideration and that his account of having been sexually assaulted showed consciousness of guilt.[37] Furthermore, Appellant has not shown how this ar-

---

[37] The military judge instructed the members that evidence Appellant "may have made an allegation of being sexually assaulted" by KG may be considered "for its tendency, if any, to show [Appellant's] awareness of his guilt of the offense of sexual assault as alleged in Specification 1 of Charge I." Appellant was acquitted of this specification.

gument affected any of the specifications involving KG other than the ones of which he was acquitted.

Appellant also claims trial counsel made disparaging comments about Appellant and his defense in his rebuttal argument by twice directing the members to follow the evidence instead of the "shiny monkey over here," and also by accusing the Defense of "wordsmithing." We have carefully reviewed the context with which trial counsel made his "shiny monkey" comments and conclude he was referring figuratively to weaknesses in the Defense argument and cautioning the members to not be distracted by Defense claims that trial counsel believed were unsupported by evidence. Neither word choice, however, obviously disparaged Appellant personally or accused Appellant of fabricating a defense. *Cf. Fletcher*, 62 M.J. at 182. Appellant was not prejudiced by this argument, and we find it was not plain error.

### d. Arguing the Members Consider Facts Not in Evidence and View Evidence on the Internet

Appellant claims trial counsel made reference to facts not in evidence in his rebuttal argument when he claimed that KG remained in a relationship with Appellant after being abused in the same manner that victims of domestic violence remain in a relationship with an intimate partner although they are abused. Trial counsel argued, "And then they say she would have left. She would have left, members. Well, then I guess if [KG] would have left, then every other battered girlfriend, battered spouse, that's in a difficult relationship, or in a relationship, a complicated relationship, where they love the person but they're mean to them. They stay in it many times. But now, because she didn't leave, because she didn't leave in the midst of when things are going on—it didn't happen at all?"

We find trial counsel's reference to "every other" battered girlfriend or spouse and domestic violence victims generally staying in relationships "many times" was improper argument, but it did not prejudice Appellant. Trial counsel interjected his personal belief, certainly not facts that were in evidence, about how KG behaved consistently with other victims of domestic abuse. *Cf. Fletcher*, 62 M.J. at 180 (trial counsel cannot argue irrelevant matters such as personal opinions and facts not in evidence). Yet this one statement was but a very small part of the trial counsel's rebuttal argument, and was not a point he focused on. After he made the comment, he did not revisit the issue again. Furthermore, the argument Appellant complains of affected the four specifications involving KG, of which Appellant was acquitted, most significantly the offense of assault consummated by a battery. Thus, we find Appellant was not prejudiced by trial counsel's improper argument.

Appellant also claims trial counsel encouraged the members to do their own research by accessing a website to download video recordings of KG that Appellant was charged with posting online, and that were discussed at trial. Trial counsel argued, Appellant "goes and puts them out there so that anybody can download them. *You* can download them. Anybody in this courtroom, just Google it. Go to [***].com. Download it, for all the world to see." (Emphasis added).

On one hand trial counsel was explaining why KG decided to report Appellant after discovering the recordings, underscoring KG's humiliation from knowing anyone could capably access these recordings because Appellant's conduct made them accessible to anyone. On the other hand, whether he intended to or not, trial counsel's words plainly encouraged "[a]nybody in this courtroom" including *the members* to whom trial counsel was arguing to "just Google" the website and observe the images of KG that were admitted in evidence.

However, assuming this argument was error, we find the comment neither pervasive nor severe. Furthermore, the military judge took appropriate measures to cure the misstep by giving the following instruction after argument:

> During your deliberations, you . . . may not use any electronic device or media to communicate to anyone outside the deliberation room or to conduct any research about this case. So put another way, you will have your phones off. Not silent, you will have it off or just not in the room at all. You can give it to the bailiff if you want.

We are confident that trial counsel's argument that the members consider facts not in evidence and view evidence on the Internet did not amount to prejudicial error and that the members convicted Appellant on the basis of the evidence alone.

### e. Characterization of Evidence and Improper Vouching

Appellant claims trial counsel mischaracterized evidence when he argued that records from Appellant's Internet service provider linked Appellant to the same IP address used to upload images of KG to a website, "when in fact, it was not assigned to Appellant until 31 May 2015," or two weeks after videos of KG were posted online. Appellant also claims trial counsel mischaracterized Appellant's admissions in his text message to KG and conversation with Amn HM about posting videos of KG to the Internet, "when Appellant only admitted to posting pictures of KG."

We disagree with Appellant's claims and find that trial counsel argued reasonable inferences from the evidence. Trial counsel did not claim that records from Appellant's Internet service provider linked Appellant to the IP address on a particular date, but instead argued that the record showed an association with Appellant and his physical address on Altus AFB, which it did. Trial counsel's argument that Appellant admitted to posting videos of KG, when the evidence was that he had posted pictures of her online, was also a reasonable inference. In the case of the text message Appellant sent to KG in which Appellant stated he did "feel bad for posting the pictures online," trial counsel directed the members to review the Prosecution exhibit that contained the text message so they could make the determination themselves. We find these statements were supported by the evidence.

Appellant also claims trial counsel interjected his personal views to misstate and vouch for evidence when he argued that "*we know* the [webcam] was working. *We know*, even though it had a green screen that came up." (Emphasis added). Similarly in rebuttal, the trial counsel argued "*we know* the [web]cam did work. We don't know exactly how [Appellant] made it work, but it certainly worked to take the pictures." (Emphasis added). We disagree that the Government misstated evidence when it argued that Amn HM's built-in camera was functional, in contrast to Appellant's contention on appeal that "[i]n fact, Appellant was unable to take pictures of her with her computer because the webcam on her computer was broken." Mere disagreement about the conclusions to be drawn from the evidence does not amount to mischaracterization.

However, we do agree with Appellant that trial counsel engaged in improper argument in a few instances when he interjected his improper personal assurance, "we know," of the Government's evidence. *See Fletcher*, 62 M.J. at 180 ("trial counsel repeatedly vouched for the credibility of the Government's witnesses and evidence," for example by couching a conclusion with '*we know*'"). In assessing prejudice, we note that these three instances were but a small part of an approximately 21-page findings argument including rebuttal. This stands in marked contrast to *Fletcher*, where trial counsel's argument amounted to plain error when, on more than two dozen occasions, she offered personal commentary on the veracity of the testimony and evidence, and "[s]he repeatedly inserted herself into the proceedings by using the pronouns 'I' and 'we.'" *Id*. at 181. We distinguish those facts from the minimal personal assurances by trial counsel in this case. Consequently, we find the comments neither pervasive nor severe. Furthermore, we find the military judge's prefatory instructions that the arguments by counsel are "an exposition of the facts . . . as they view them," was a prophylactic measure that minimized the impact of trial counsel's vouching. Finally, the improper comments

had no logical relationship to the strength of the Government's evidence supporting the findings of guilty, which consisted of the pictures of Amn HM found on his personal cell phone, forensic analysis of his media, and expert opinion testimony explaining how he captured the recordings. After balancing the three *Fletcher* factors, we are confident that the improper comments by trial counsel that vouched for the evidence did not amount to plain error and that the members convicted Appellant on the basis of the evidence alone.

### f. "They Didn't Offer You This Computer"

The Government always has the burden to produce evidence on every element and to persuade the members of guilt beyond a reasonable doubt. *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995) (citation omitted) ("The Due Process Clause of the Fifth Amendment to the Constitution requires the Government to prove the defendant's guilt beyond a reasonable doubt."). This burden never shifts to the Defense and the Government "may not comment on the failure of the defense to call witnesses." R.C.M. 919(b), Discussion; *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990) (citation omitted). A trial counsel's suggestion that an accused may have an obligation to produce evidence of his own innocence is "error of constitutional dimension." *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (citation omitted).

Appellant complains that trial counsel improperly shifted the burden of proof to Appellant with respect to Specification 3 of Charge II by arguing in rebuttal that Appellant failed to produce Amn HM's broken computer. Appellant observes that trial counsel argued "*they* didn't offer you this computer that had the green screen." (Emphasis added).

We find Appellant has not shown that trial counsel shifted the burden of producing evidence to the Defense. Instead, we find that trial counsel was countering the Defense's findings argument by paraphrasing the Defense's point that "they," meaning the Government, failed to analyze and offer evidence from Amn HM's laptop. Trial counsel stated:

> What makes the most sense is that [Appellant] did it. That makes the most sense, not what defense—its shiny monkey over here—look over here. *He's not guilty*, look over here. *It's somebody else. Don't look at the fact that Airman [HM]'s photos were on his cell phone, that in his media, he has shellbags to [her] laptop.* Don't look at the fact that they say it's a green screen, so I guess the computer doesn't work. And *they* didn't offer you this computer that had the green screen. Well, you have photographs from the 20th of June in her room and she knows when they were taken. So we know the cam[era] did

> work. We don't know exactly how [Appellant] made it work, but it certainly worked to take the pictures. And they all ended up on [Appellant's] cell phone.

(Emphasis added).

Just as trial counsel was not arguing the Government's position that, "[h]e's not guilty," "somebody else" recorded Amn HM, or "Don't look at the fact that" photos of Amn HM were found on Appellant's cell phone, which were opposite to the Government's position throughout trial, it stands to reason that "*they* didn't offer" Amn HM's computer was trial counsel's parroting the Defense's claim that the Government failed to produce evidence, and not a burden shift to the Defense to produce evidence as Appellant claims it was.

Even if some members may not have understood that trial counsel was essentially deriding the Defense's earlier points that the Government's case involving Amn HM was weak because the Government failed to produce her laptop, we do not find this single comment was prejudicial. The record establishes that each member understood in voir dire that the burden of proof to establish Appellant's guilt rested solely on the Government and that the burden never shifted to the Defense to establish Appellant's innocence. The military judge similarly instructed the members after the close of evidence that the burden never shifted to Appellant to establish innocence or to disprove the facts necessary to establish each element of an offense. We conclude trial counsel's argument, "[T]hey didn't offer you this computer," was not plain error.

After evaluating the entirety of trial counsel's findings argument, including his rebuttal argument when many of the comments Appellant complains of occurred, we find no plain or obvious error that prejudiced Appellant. We further conclude that Appellant was not prejudiced by the cumulative impact of any error. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (citation omitted) (Cumulative error occurs when "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding."). Accordingly, we decline to grant Appellant relief for any prosecutorial misconduct and improper comments during findings argument.[38]

---

[38] We similarly reject Appellant's claim raised as a separate assignment of error that his trial defense counsel were ineffective for failing to object to trial counsel's improper closing argument, including rebuttal. We find counsel were not ineffective because the objectionable comments were limited and counsel's level of advocacy did not fall measurably below the performance ordinarily expected of fallible lawyers, *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted), and thus,

*(Footnote continues on next page)*

**G. Allegations of Ineffective Assistance of Counsel**

Appellant submitted declarations in which he asserted that his trial defense counsel were ineffective in 16 allegations of error. In response to Appellant's claims, we ordered and received declarations from Appellant's trial defense counsel, Major (Maj) AH and Captain (Capt) DC, which refute Appellant's claims and are generally consistent with one another. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967).

Appellant alleges his trial defense counsel were ineffective in nine assignments of error which we address in our opinion.[39] We find no prejudicial error warranting relief with respect to these issues. Appellant also contends that his trial defense counsel were ineffective in an additional five assignments of error, which we considered and summarily resolve here. Appellant claims his counsel failed to: (1) challenge the legality of the searches and seizures of Appellant's computers, hard drives, and phones; (2) object to the Article 32, UCMJ, 10 U.S.C. § 832, report of the preliminary hearing officer (PHO) on grounds that the PHO's recitation of the elements of wrongful distribution of recordings of KG and the timeline regarding the alleged offense involving Amn HM were incorrect; (3) question KG about her report to civilian law enforcement that pictures and videos posted online were ones KG took herself and voluntarily gave to Appellant; (4) provide Appellant copies of their notes of an interview with the Government's digital forensic expert witness so that Appellant could have assisted his counsel in the preparation of his defense; and (5) consult with Appellant about their interview of Amn HM.[40,41] We find these issues do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

---

Appellant's claim does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

[39] *Supra* nn.13, 20, 24–26, 29, 36, 38, and *infra* n.59.

[40] Appellant personally asserts issues (4) and (5) pursuant to *Grostefon*.

[41] We have considered the five issues raised by Appellant and find as follows. With respect to issue (1), Appellant has not shown there is a reasonable probability that a motion to exclude evidence would have been meritorious. *See United States v. Loving*, 41 M.J. 213, 244 (C.A.A.F. 1994). With respect to issue (2), trial defense counsel's decision not to challenge the PHO's report did not fall below an objective standard of reasonableness. *See Gutierrez*, 66 M.J. at 331. With respect to issue (3), Appellant

*(Footnote continues on next page)*

Appellant also alleges his trial defense counsel were ineffective in two further assignments of error in that they failed to (1) correctly advise Appellant on his right of allocution in findings[42] and (2) inform Appellant, and argue to the members during sentencing, that a punitive discharge could result in consequences relating to naturalization, citizenship, and deportation.

We disagree and address Appellant's allegations in turn.

**1. Law**

The Sixth Amendment to the United States Constitution[43] guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (citation omitted), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984) (citations and footnote omitted). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel," *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)), and consider "whether counsel's performance fell below an objective standard of reasonableness." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted).

We review allegations of ineffective assistance of counsel de novo. *Gooch*, 69 M.J. at 362 (citing *Mazza,* 67 M.J. at 474). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient and that the appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

---

has not shown a reason for us to second-guess the decisions made by trial defense counsel not to question KG differently. *See Mazza*, 67 M.J. at 475 (C.A.A.F. 2009). With respect to issues (4) and (5), we find that trial defense counsel had a reasonable explanation for their actions, their performance was not deficient, and Appellant suffered no prejudice. *See Gooch*, 69 M.J. at 362 (C.A.A.F. 2011).

[42] Appellant personally asserts this issue pursuant to *Grostefon*.

[43] U.S. CONST. amend. VI.

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch,* 69 M.J. at 362 (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

### 2. Trial Defense Counsel's Advice about Testifying in Findings

#### a. Additional Background

Appellant claims his trial defense counsel were ineffective because they did not advise him he could "pick and choose" which "topics" to testify about in findings. Instead, according to Appellant, trial defense counsel presented his right to testify as "all or nothing" and were adamant that he not testify. Appellant now claims that if he knew he could testify about "working on Amn HM's computer without testifying about the allegations involving KG," he would have contradicted Amn HM's timeline and explained that he did not record Amn HM because the charged photographs existed on her laptop computer before he worked on it.

In response, trial defense counsel stated that they comprehensively advised Appellant of his right to testify. Capt DC explained to Appellant that he could testify on "any combination of specifications or [c]harges he wanted to." In a pretrial advisement memo, Appellant initialed that he understood his right to testify, the risks of testifying, and the fact it was his decision whether to testify in any portion of the trial. In his right to counsel advisement, Appellant initialed he understood the importance of discussing questions, issues, and concerns with trial defense counsel and that he should not enter the courtroom with "unresolved concerns [or] questions." Trial defense counsel encouraged Appellant to raise "any questions or concerns about trial preparation, trial strategy or trial decisions." Trial defense counsel advised Appellant not to testify, but emphasized it was his choice.

#### b. Analysis

The record in Appellant's case, to include the declarations, "compellingly demonstrate[s]" the improbability of Appellant's contention that he was inadequately advised on his right to testify and refutes his claim that he was inadequately represented. *Ginn*, 47 M.J. at 248. Thus, we can resolve the issue of the advice he received without ordering a fact-finding hearing. *Id.* The right to testify in one's own behalf is a choice that belongs exclusively to an appellant, not his lawyer. *See, e.g., United States v. Belizaire*, 24 M.J. 183

(C.M.A. 1987). Both trial defense counsel stated they advised Appellant of this right, and Capt DC stated they advised Appellant of his right to testify selectively. Trial defense counsel's pretrial advisements support their declarations. Although these advisements did not specifically state that Appellant had the right to testify about some offenses and not others, it is reasonable to conclude trial defense counsel discussed this option while reviewing these documents with Appellant. We further find trial defense counsel made an informed and effective recommendation that Appellant not testify even if they were adamant he not do so.

Even if we were to credit Appellant's claims over the declarations of his trial defense counsel, we nonetheless find Appellant has failed to meet his burden to establish prejudice, *Captain*, 75 M.J. at 103, and so we reject Appellant's claims without regard to the assertions in his declaration. *Ginn*, 47 M.J. at 248 ("[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis."). We have considered the possibility that Appellant misunderstood the consequences of testifying about one topic, and not others. Had he chosen to testify about working on Amn HM's computer, the scope of cross-examination could have challenged Appellant with evidence he knowingly recorded KG's private area. The Government could have confronted Appellant with the 11 images of Amn HM disrobing and of her partially nude body that Appellant selectively viewed on his cell phone, which negated Appellant's claims he innocently came into possession of the recordings by working on her computer. The Government also could have confronted Appellant with the evidence of installation files that were the means by which the Government argued that Appellant gained remote access to and control over her computer. Accordingly, if Appellant limited his testimony on direct examination to working on Amn HM's computer, his testimony as a whole would not likely have been confined to a select topic.

We find that the purported failure to advise Appellant of his right to testify about the work he performed on Amn HM's computer, whether or not owing to a miscommunication about the consequences of that decision, did not constitute ineffective assistance of counsel. Appellant has not shown there was a reasonable probability that there would have been a different result assuming the performance of trial defense counsel fell measurably below the performance ordinarily expected of fallible lawyers. *Gooch*, 69 M.J. at 362 (C.A.A.F. 2011). We therefore conclude that Appellant was not denied effective representation in the advice he received about testifying in findings.

### 3. Consequences Relating to Naturalization, Citizenship, and Deportation

#### *a. Additional Background*

Appellant submitted a declaration to this court stating he immigrated with his family to the United States from Russia in 1999 and became a naturalized citizen "on or about January 2017" on account of his military service. Appellant contends he was inadequately represented in sentencing because trial defense counsel failed to inform Appellant, introduce evidence, and argue to the panel during sentencing, that a punitive discharge could result in Appellant's naturalization being revoked,[44] confinement of 180 days or more could prevent Appellant from reacquiring United States citizenship for at least five years,[45] and his conviction could result in deportation to Russia.[46]

In response to Appellant's claims, we ordered and received declarations from Appellant's trial defense counsel. Capt DC explained that the Defense advised Appellant of these potential consequences "multiple times prior to trial and again between his conviction and . . . sentencing." Trial defense counsel were concerned that highlighting the possibility that Appellant's legal status could change or that he could be deported depending on his conviction and sentence could work to Appellant's detriment. Trial defense counsel explained this was because of the Government's successful theory in findings that Appellant had replaced the hard drive in Amn HM's laptop with a Russian substitute and caused software icons to appear in a language she could not understand, thereby facilitating his making recordings of her without her knowledge or consent. Consequently, trial defense counsel decided against emphasizing the possible consequences his conviction and a particular sentence could have on his naturalization or that Appellant could be deported reasoning that doing so could convince the members to adjudge a harsh sentence "in order to guarantee" that very result. Instead, trial defense counsel argued a proposed sentence that included only three months confinement that "would likely allow" Appellant "to stay in the United States."

---

[44] Citizenship granted because of military service "may be revoked . . . if the person is separated from the Armed Forces under other than honorable conditions before the person has served honorably for a period or periods aggregating five years." 8 U.S.C. §§ 1439(f), 1440(c).

[45] *See* 8 U.S.C. §§ 1101(f)(7), 1427(d).

[46] *See* 8 U.S.C. § 1227(a)(2)(A)(ii).

Both counsel declared they advised Appellant to talk in general terms about his immigration and naturalization in his unsworn statement. In a pretrial advisement memo completed a week before sentencing, Appellant initialed he understood his right of allocution in sentencing to include presenting an unsworn statement about himself. In addition to initialing that he understood the importance of discussing questions, issues, and concerns with trial defense counsel and that he should not enter the courtroom with "unresolved concerns [or] questions," as noted previously, Appellant indicated none of these things in the space provided to do so. Appellant also acknowledged that trial defense counsel discussed "sentencing strategy" with him and that his "attorney[s] and [Appellant had] discussed possible sentencing, including unsworn statements, witnesses and evidence." Trial defense counsel encouraged Appellant to raise "any questions or concerns about trial preparation, trial strategy or trial decisions."[47]

Appellant gave both a verbal and written unsworn statement that did not mention the possible consequences relating to naturalization, citizenship, or deportation. He relayed the hardships of living in Russia and the process of immigrating with his family. Appellant stated, "I became an American citizen in early 2016,"[48] and "I am currently in the process of denouncing my Russian citizenship."[49] Although he did not concede that a punitive discharge was appropriate, Appellant remarked, "Whether you decide to discharge me or not, I know my Air Force career is likely to come to an end," and "I know that my continued service will not be allowed."

### b. Analysis

The record in Appellant's case, to include the declarations of his trial defense counsel and the memoranda that Appellant initialed and signed, compellingly demonstrates the improbability of Appellant's ineffective assistance of counsel allegation. *Ginn*, 47 M.J. at 248. Appellant was advised about his

---

[47] Appellant also initialed acknowledgement of the following: "*If you have any questions, issues, concerns <u>at all</u>, it is extremely important that you indicate what those are now and allow us to discuss them before trial starts. I don't want you to enter your trial with unresolved concerns/questions.*"

[48] As noted, Appellant's declaration states he became a naturalized citizen "on or about January 2017," and not a year earlier; however, the discrepancy is not significant to our analysis.

[49] In Appellant's declaration he avers somewhat differently, "I could have talked [in the unsworn statement] about what would happen to me, as a former US servicemember who *renounced* his Russian citizenship." (Emphasis added).

right to present information to the members in sentencing and was specifically advised and encouraged to discuss any concerns with trial defense counsel. We find it improbable that Appellant would have had even a lingering question about possible adverse consequences relating to naturalization, citizenship, and deportation as his case proceeded to trial—the type of question his counsel encouraged him to resolve by discussing the matter before trial. Appellant's declaration is conspicuously silent about when and how he became aware of these possible adverse consequences, and why he was not already aware of the five-year honorable service requirement having undergone naturalization proceedings specifically conditioned on honorable military service.[50] Consistent with their declarations, trial defense counsel argued for a sentence to avoid these possible consequences. Even if we were to assume the truth of Appellant's allegations, we nonetheless find trial defense counsel provided a sound tactical explanation for their advice to Appellant about his unsworn statement, their actions in preparing and presenting the defense sentencing case were reasonable, and their level of advocacy was within the performance ordinarily expected of fallible lawyers. *Gooch*, 69 M.J. at 362.

We also reject Appellant's claims because they amount to speculative and conclusory observations about the consequences of his conviction and sentence on his legal status. *Id.* Citizenship through expedited naturalization "may be revoked" if a servicemember has not served honorably in the Armed Forces for an aggregate of five years.[51] Appellant avers that if his citizenship were revoked then he would be deportable on grounds that he had been convicted of two or more offenses involving moral turpitude[52] and would be re-

---

[50] *See* 8 U.S.C. § 1440(a); *see also United States v. Moulton*, 47 M.J. 227, 230 (C.A.A.F. 1997) ("When factual information is central to an ineffectiveness claim, it is the responsibility of the defense to make every feasible effort to obtain that information and bring it to the attention of the appellate court.").

[51] 8 U.S.C. §§ 1439(f), 1440(c). Appellant entered active duty on 19 February 2013, and had completed four years and three months of service when the sentence was adjudged.

[52] 8 U.S.C. § 1227(a)(2)(A)(ii) ("Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable."). Appellant, who was a naturalized citizen when he committed the offenses and was convicted, asserts he is subject to this provision without explaining its applicability to anyone other than an alien, i.e., a non-citizen of the United States.

stricted from naturalizing anew after having served confinement for at least 180 days.[53]

We find that Appellant's claims—hinged on the statutory condition that his naturalization "may be revoked"—are not so certain as to be the "direct and proximate consequence" of his sentence that included a punitive discharge and greater than 179 days confinement, *see United States v. Talkington*, 73 M.J. 212, 217 (C.A.A.F. 2014) (emphasis added) (quoting *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988), as opposed to a direct and proximate consequence of the conviction, *see id.* at 216–17 ("Collateral consequences" of a court-martial conviction are ordinarily not germane to determining an appropriate sentence because the collateral consequence "operates independently of the sentence adjudged."). At most, Appellant identifies the possibility of an adverse effect on his legal status, much less so a direct and proximate one.

Appellant claims the decision by the United States Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010), requires a servicemember "be advised of adverse immigration consequences related to criminal charges and convictions." *Padilla* does not sweep so broadly and resolved different issues than the one at hand. Unlike *Padilla*, which involved deportation consequences of a plea of guilty and, therefore, waiver of a constitutional right, it is not obvious that Appellant's revocation of naturalization would be "presumptively mandatory," or "could easily be determined" from the statute;[54] and, unlike Padilla's defense attorney, trial defense counsel did not give Appellant false assurances about the effect of a trial decision on his legal status. *Id.* at 369. The United States Supreme Court observed that *deportation* of a non-citizen is "practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses." *Id.* at 364.

---

[53] An applicant for citizenship must show good moral character during the five years preceding the filing of an application. 8 U.S.C. § 1427(d). A noncitizen is disqualified from showing good moral character if "confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more." 8 U.S.C. § 1101(f)(7).

[54] Although expedited citizenship granted to servicemembers "may be revoked in accordance with section 1451 of this title," *see* 8 U.S.C. §§ 1439(f), 1440(c), we note that the revocation statute, 8 U.S.C. § 1451, makes no provision for grounds other than concealment of material evidence, refusal to testify, membership in certain organizations, and procuring citizenship unlawfully, none of which the facts in the record plainly implicate.

In contrast to the practical inevitability of deportation of a non-citizen, petitions by the United States to revoke a citizen's naturalization, which are similarly cognizable under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, are nonetheless the subject of civil proceedings in federal district court. *See, e.g.*, *United States v. Sommerfeld*, 211 F.Supp 493 (E.D. Pa. 1962); *United States v. Tarantino*, 122 F. Supp. 929 (E.D.N.Y. 1954). The Government bears the burden of proof in a revocation proceeding by clear, convincing, and unequivocal evidence. *See Kungys v. United States*, 485 U.S. 759, 768 (1988) (citation omitted).

We conclude that the consequences to Appellant's naturalization, and ultimately citizenship, and possible deportation, if any, are not so obviously the direct and proximate consequence of Appellant's sentence that trial defense counsel were ineffective for failing to pursue an alternative strategy. Furthermore, we conclude that even if trial defense counsel—or Appellant in a sworn or unsworn statement—presented the members with the possible repercussions of a punitive discharge and greater than 179 days confinement to his legal status, in all probability trial counsel would have presented rebuttal evidence, or the military judge would have instructed the members, that such repercussions were at best uncertain.

Even if trial defense counsel's representation was ineffective as alleged by Appellant, and the possible consequences relating to naturalization, citizenship, and deportation were a direct and proximate consequence of the sentence, we would nonetheless afford Appellant no relief. We find no reasonable probability that presenting this information to the members would have produced a different, more favorable result for Appellant, *Gooch*, 69 M.J. at 362. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. On these facts we find that a strategy of emphasizing potential consequences relating to Appellant's legal status was not likely to have resulted in a sentence of both no punitive discharge and at least 66 fewer months of confinement. To the contrary, and as Appellant's trial defense counsel explain in their declarations, had the sentencing authority known of the possible consequences of Appellant's conviction and their sentencing options, a reasonable probability existed that the members would have adjudged a sentence Appellant sought to avoid.

Trial defense counsel's explanation of the defense sentencing strategy included reasonable considerations that we will not second-guess, *Mazza*, 67 M.J. at 475, and so we reject Appellant's claims without regard to the assertions in his declaration. *Ginn*, 47 M.J. at 248 ("[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis."). In our view, it is not reasonably probable Appellant would have avoided

the possible consequences Appellant complains his counsel were ineffective for failing to elude.[55]

While Appellant's counsel may have chosen a different sentencing strategy, it does not mean that the strategy used at trial was objectively unreasonable. We evaluate trial defense counsel's performance not by the success of their strategy, but rather by whether the counsel made reasonable choices from the alternatives available at trial. *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998). We find that they did, and therefore conclude that Appellant was not denied effective representation in sentencing under applicable standards of review.

We further conclude from our review of all 16 allegations of ineffective assistance of counsel, the record, and all post-trial declarations that Appellant was neither deprived of a fair trial nor was the trial outcome unreliable. *See Strickland*, 466 U.S. at 698. Accordingly, we find Appellant's claims of ineffective assistance of counsel to be without merit.

## H. Sentence Severity

Appellant claims his sentence that included confinement for six years and a dishonorable discharge was inappropriately severe. However, Appellant provides no factual basis for this claim and except for his argument that "Appellant may not have been an ideal airman, [but] he did not deserve a punitive discharge," his brief is a renewed attack on the findings and sentence recast as sentence severity and appropriateness.[56]

---

[55] We would reach the same conclusion if the members had been informed of these possible consequences and adjudged a sentence that included a punitive discharge and greater than 179 days confinement. "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted).

[56] Appellant's counsel (1) argues "[a]ny sentence is too harsh . . . because [Appellant] should not be convicted of anything;" (2) claims trial defense counsel failed to provide justification for the members to adjudge the Defense's recommended sentence; (3) reasserts that trial defense counsel's failure to argue the consequence of a particular sentence on naturalization, citizenship, and deportation was prejudicial error; and (4) reminds us of our authority to reassess a sentence or remand for a rehearing.

### 1. Additional Background

Testimony at trial revealed KG felt violated, embarrassed, and upset that Appellant posted images of her online, and was "crying" and "hysterical" when she talked about it with her boyfriend, SS. In her unsworn statement she described concern that the videos would be discovered by future employers or children.

Amn HM and Appellant worked and spent off-duty time together. She considered Appellant her wingman and best friend. She testified being "shell-shocked" learning that pictures of her disrobing and partially nude were found on Appellant's media. In her unsworn statement she described the effect Appellant's misconduct had on her personally, to include impact to her friendships, trust in others, sense of community, and work environment.

### 2. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 142–48 (C.A.A.F. 2010).

### 3. Analysis

We have given individualized consideration to Appellant, the nature and seriousness of his offenses, his record of service, and all other matters contained in the record of trial. The offenses of which Appellant was convicted resulted in his victims suffering direct emotional harm. Evidence at trial suggests that videos Appellant distributed of KG will remain accessible in the public domain.

Appellant faced a maximum term of confinement of 17 years. Trial counsel recommended a sentence of a dishonorable discharge, confinement for ten years, and total forfeiture of pay and allowances. The adjudged sentence included a dishonorable discharge and confinement for six years, which was substantially more severe than trial defense counsel's recommendation of three months confinement, total forfeitures, and reduction to the grade of E-1. Notwithstanding disparities in the recommendations of both counsel com-

pared to the adjudged sentence, we find Appellant's approved sentence of a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1 is not inappropriately severe.

## I. Error in the Staff Judge Advocate's Recommendation

We also reviewed an error in the staff judge advocate's recommendation (SJAR) that misstated the convening authority's power to take action and ordered the Government to show cause why the court should not remand the case for new post-trial processing.

### 1. Additional Background

The SJAR misadvised the convening authority: "[Y]ou do not have the authority to disapprove, commute or suspend in whole or in part the confinement or punitive discharge" and recommended the sentence be approved as adjudged. In his clemency submission, Appellant requested the convening authority "reinstate my rank, upgrade my current discharge to a Bad Conduct Discharge, and do whatever is in your power to reduce my excessive 6 year sentence in any way possible." Trial defense counsel requested the convening authority "review [Appellant's] attached clemency request and grant the requested relief." In the addendum to the SJAR the SJA advised the convening authority that his previous recommendation to approve the adjudged findings and sentence remained unchanged.

### 2. Law

We review de novo alleged errors in post-trial processing. *See United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (citation omitted); *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004). Although the threshold for establishing prejudice in this context is low, the appellant must nonetheless make at least "some colorable showing of possible prejudice." *United States v. Scalo*, 60 M.J. 435, 436–37 (C.A.A.F. 2005) (quoting *Kho*, 54 M.J. at 65).

The National Defense Authorization Act (NDAA) for Fiscal Year 2014 (FY14) modified Article 60, UCMJ, 10 U.S.C. § 860, and limited the convening authority's ability to affect an adjudged sentence of confinement for more than six months or a sentence of dismissal, dishonorable discharge, or bad-conduct discharge. Pub. L. No. 113–66, § 1702, 127 Stat. 672, 954–58 (2013); *see* Article 60(c)(4)(A), UCMJ, 10 U.S.C. § 860(c)(4)(A) (2014). The effective date of the change was 24 June 2014. Pub. L. No. 113–66, § 1702, 127 Stat. at 958. The NDAA for Fiscal Year 2015 clarified that, where a court-martial includes a conviction for an offense committed before 24 June 2014 and an offense committed on or after 24 June 2014, the convening authority has the same clemency power under Article 60, UCMJ, as was available before 24

June 2014, except with respect to a mandatory minimum sentence under Article 56(b), UCMJ, 10 U.S.C. § 856(b). Pub. L. No. 113–291, § 531, 128 Stat. 3292, 3365 (2014).

### 3. Analysis

The SJA misadvised the convening authority and this was error. Appellant was found guilty of the wrongful and knowing recording of the private area of KG between on or about 1 December 2013 and on or about 31 July 2014. Appellant was convicted of an offense committed before 24 June 2014, and thus the FY14 NDAA changes to Article 60, UCMJ, did not operate to limit the convening authority in Appellant's case as the SJA advised that it did.[57] *See United States v. Rogers*, 76 M.J. 621, 626 (A.F. Ct. Crim. App. 2017) ("We will not conduct a post-trial dive below the charged dates to attempt to determine with certitude when an offense occurred for Article 60, UCMJ, purposes."). The convening authority had the authority to dismiss any charge or specification by setting aside a finding of guilty. The convening authority also had the authority to disapprove a sentence in whole or in part, mitigate the sentence, and change a punishment to one of a different nature so long as the severity of the punishment was not increased.[58]

The SJAR was incorrect in that the convening authority had plenary authority to disapprove, commute, or suspend in whole or in part the adjudged sentence. This error is not addressed in the clemency submission or addendum to the SJAR. Yet, finding error does not end our inquiry, as Appellant must demonstrate a colorable showing of possible prejudice in order to prevail on this issue. *Scalo*, 60 M.J. at 436–37. Whether an appellant was prejudiced by a mistake in the SJAR generally requires a court to consider whether the convening authority "plausibly may have taken action more favorable to" the appellant had he or she been provided accurate or more complete information. *United States v. Johnson*, 26 M.J. 686, 689 (A.C.M.R. 1988), *aff'd*, 28 M.J. 452 (C.M.A. 1989) (mem.); *see also United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996).

We find Appellant has not met his burden of establishing prejudice. Responding to a show-cause order of this court, the Government submitted a declaration from the SJA who conceded the advice he gave to the convening

---

[57] Furthermore, a punitive discharge was not a mandatory minimum sentence. *MCM,* pt. IV, ¶ 45c.e.(2) and (3).

[58] This reflects the language of R.C.M. 1107(d)(1) in effect prior to 24 June 2014, and as it appeared in the *Manual for Courts-Martial, United States* (2012 ed.).

authority was incorrect because he "did not inform the [convening authority] of his full power to grant clemency under Article 60, UCMJ." However, the SJA asserted that even with the convening authority's broader discretion, he still would have advised the convening authority "to deny [Appellant]'s clemency request and approve the sentence as adjudged." The convening authority also submitted a declaration noting that he would not have provided Appellant with relief on the adjudged sentence even if he had "been properly advised of the options available" during clemency.

Relying on these declarations, we find it was not plausible that the convening authority may have taken action more favorable to Appellant had the SJA provided accurate information to the convening authority about his full power to grant clemency. *Johnson*, 26 M.J. at 689. As Appellant is unable to demonstrate a colorable showing of possible prejudice, we find he cannot prevail on this issue. *Scalo*, 60 M.J. at 436–37.[59]

**J. Timeliness of Appellate Review**

We review de novo whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

Appellant's case was originally docketed with the court on 15 September 2017. The delay in rendering this decision by 15 March 2019 is presumptively

---

[59] We similarly reject Appellant's claim raised pursuant to *Grostefon* that his trial defense counsel were ineffective for failing to inform Appellant he could request the convening authority reduce his sentence by five and a half years or more, and disapprove the dishonorable discharge "to avoid consequences relating to Appellant's naturalization, citizenship, and deportation." We find the counsel who advised Appellant in clemency proceedings was not ineffective because Appellant has not shown that there was a reasonable probability that there would have been a different result assuming counsel's advice had been deficient, *see Gooch*, 69 M.J. at 362, and thus, Appellant's claim does not require further discussion or warrant relief. *See Matias*, 25 M.J. at 361.

unreasonable. However, we determine no violation of Appellant's right to due process and a speedy post-trial review and appeal.

Analyzing the *Barker* factors, we find the length of the delay—three months—is not excessively long. The reasons for the delay include the time required for Appellant to file his brief on 10 September 2018 and the Government to file its answer on 20 November 2018. Along with Appellant's reply on 14 December 2018, Appellant submitted a declaration identifying six additional allegations of ineffective assistance of counsel, which the Government answered on 15 March 2019, and Appellant replied on 22 March 2019. On 17 January 2019, after all pleadings were filed, the court ordered the Government to show good cause why the court should not set aside the action of the convening authority and direct new post-trial processing, which the Government answered on 19 February 2019.

The court affirms the findings and sentence in this case. We recognize that Appellant began serving his six years of confinement on 19 May 2017; however, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay for the court to complete appellate review of his case, and we find none.

Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. As a result, there is no due process violation. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED**.


FOR THE COURT

JULIE L. ADAMS
Deputy Clerk of the Court